ATLANTA ATHLETIC CLUB, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Atlanta Athletic Club v. Commissioner
Docket No. 28512-88
United States Tax Court
T.C. Memo 1991-83; 1991 Tax Ct. Memo LEXIS 97; 61 T.C.M. (CCH) 2011; T.C.M. (RIA) 91083; February 28, 1991, Filed *97 Decision will be entered under Rule 155. Petitioner is a social club which is exempt from Federal income tax. Petitioner had unrelated business taxable income for the years in issue. Petitioner offset losses from nonexempt, nonmember undertakings against its investment income. Petitioner did not report gain on the sale of property, claiming that such property was used directly in the performance of its exempt function. Held: Petitioner is not entitled to offset losses from nonexempt, nonmember undertakings against investment income because petitioner did not enter into such undertakings with an intent to profit. Held further: Petitioner's undertakings, excluding investment income, constitute a single activity in which petitioner is entitled to offset the losses from all undertakings against the gross receipts from all undertakings, excluding investment income. Held further: Petitioner is not entitled to deduct certain expenditures made to comply with P.G.A. requirements to host the 1981 P.G.A. Championship tournament because they are capital expenditures. Held further: Petitioner must recognize and report the gain from the sale of property as unrelated business *98 taxable income because petitioner did not directly use the property for exempt purposes. Terence J. Greene and Sidney O. Smith, for the petitioner. Eric B. Jorgensen, for the respondent. WHITAKER, Judge. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in petitioner's Federal income taxes for the taxable years ended March 31, 1980, through March 31, 1986, as follows: Tax Year Ended
Deficiency
March 31, 1980
$   6,054
March 31, 1981
3,558
March 31, 1982
321,225
March 31, 1983
6,367
March 31, 1984
127
March 31, 1985
658,063
March 31, 1986
10,796
The issues for decision are: (1) Whether petitioner is entitled to offset losses from nonexempt, nonmember undertakings against its investment income for the taxable years ended March 31, 1980, through March 31, 1986 (the loss issue). We hold that petitioner is not entitled to offset the losses from such undertakings against its investment income for the taxable years in issue because petitioner did not enter into such undertakings with an intent to profit. We hold that petitioner's undertakings, excluding investment income, constitute one activity; and, therefore, petitioner *99 is entitled to offset its losses from all such undertakings against its gross receipts from all such undertakings. (2) Whether petitioner is entitled to deduct expenditures in the amount of $ 265,033 for redesigning of certain golf course greens, for constructing a new practice green, and for reworking the drainage system on its golf course, in order to comply with P.G.A. requirements to host the 1981 P.G.A. Championship tournament, from its unrelated business taxable income for the taxable year ended March 31, 1982 (the capitalization issue). We hold that petitioner is not entitled to deduct these expenditures from its unrelated business taxable income for the taxable year ended March 31, 1982, because the expenditures are capital expenditures. (3) Whether petitioner should have recognized and reported gain in the amount of $ 2,330,889 for its taxable year ended March 31, 1985, as unrelated business taxable income from the sale of 108 acres of property (Tracts A and B) owned by petitioner (the gain issue). We hold that petitioner must recognize and report the gain from the sale of Tracts A and B for its taxable year ended March 31, 1985, because petitioner did not directly *100 use the property for exempt purposes.
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations and attached exhibits are incorporated herein by this reference. Petitioner, the Atlanta Athletic Club (the Club), is a social club organized for pleasure and recreation and is and at all times during the taxable years in issue has been exempt from Federal income tax under section 501(c)(7). [1] Petitioner is and was a Georgia nonprofit corporation with its principal office at Athletic Club Drive, Duluth, Georgia, at the time the petition was filed on October 31, 1988. Petitioner was incorporated on August 15, 1898. Petitioner timely filed Forms 990 and 990-T with the Internal Revenue Service Center in Atlanta, Georgia, in each of the taxable years ending March 31, 1975, through March 31, 1986. Petitioner's exempt activities are the provision *101 of pleasure and recreation to its members. Petitioner operates two 18-hole golf courses, a clubhouse, a swimming pool, tennis courts, and other recreational facilities for the benefit of its members and their guests. In addition to maintaining facilities for its members, from time to time, petitioner also makes its facilities and services available to nonmembers. For example, from time to time, petitioner hosts nonmember wedding receptions and banquets, nonmember amateur golf and tennis tournaments, and other Monday nonmembers activities. Petitioner also hosted two professional golf tournaments, the 1976 U.S. Open and the 1981 P.G.A. Championship tournaments. These events are a regular and continuous part of the nonmember activity of petitioner. Since one of the issues in this case is whether these various nonexempt, nonmember events constitute one activity or separate activities, at this point, we will refer to these nonexempt, nonmember events described above as undertakings. It will be understood that when we use the term "undertaking," we are referring to a nonexempt, nonmember function of petitioner. The original site of the Club was at East Lake Country Club. In the *102 early 1960's, after determining that the membership was moving away from the Club's location at East Lake to the north and northeast of Atlanta, the Board of Directors (the Board) decided, with the approval of the stockholders, to purchase land in the north and northeast area of Atlanta for the future site of their Club. Petitioner purchased 617.12 acres of land (the Property) on February 14, 1964. The majority of the land or 425.61 acres are situated east of Highway 141 (the Eastside Property). The remaining acreage or 191.51 acres are situated west of Highway 141 (the Westside Property). Petitioner named the Club at this new site The River Bend Country Club. Petitioner did not have the opportunity to buy the Property in pieces. At the time of purchase, the Board considered that the entire Property would be necessary for what they wanted. The Board informed the stockholders that the Property had been inspected and endorsed by a noted golf course architect and by all members of the Board. After the purchase of the Property, one of the experts hired by petitioner to analyze the Property determined that the Eastside Property was the best place to build a golf course. The River *103 Bend golf course which is located on the Eastside Property was opened on May 27, 1967. Petitioner also constructed a clubhouse, swimming pool, and another nine-hole golf course on the Eastside Property. In 1968, petitioner purchased an additional 30.5954 acres adjacent to the northern boundary of the Eastside Property and constructed an additional nine holes on that acreage which completed the second golf course known as the Highland Course. In the early 1960's, when the Property was purchased, Highway 141 was a two-lane country road with little traffic. The area around the Highway was forest and was not heavily populated. Consultants advised the Board that the Westside Property would be suitable for additional golf facilities, either a none-hole course or a par-three course. Petitioner made preliminary plans for an outdoor fitness area on the Westside Property. On November 8, 1967, when members inquired about purchasing property from the Club for housing, petitioner notified members that the Club had no property for sale. In 1976, during the U.S. Open tournament, petitioner used the Westside Property for parking. Petitioner sought advice from the Georgia Fish and Forestry *104 Commissioner regarding stocking and maintaining the Club's lakes to provide good fishing to the members. Both the Eastside and Westside Properties contain lakes. In 1974, petitioner obtained rezoning of the Westside Property from agricultural to Community Unit Development zoning which would allow for the development of condominiums or cluster housing. In 1981, the Westside Property was rezoned again to provide for agricultural use. Petitioner offered two reasons for this reversion. First, petitioner did not have any specific plans to develop or sell the Westside Property; and for the next 5 years or so, petitioner only planned to use the Westside Property for recreational purposes. Second, the current zoning distorted the overall planning of the county. During the late 1970's and early 1980's, traffic on Highway 141 increased to the point that crossing Highway 141 between the Eastside and Westside Properties became extremely hazardous. The highway has since been enlarged to three lanes; and, at rush hour, the traffic is bumper-to-bumper. On August 1, 1984, to finance the construction of a tennis center and for substantial renovation of its clubhouse on the Eastside Property, *105 the Club sold a portion of the Westside Property (Tracts A and B). Petitioner retained approximately half of the Westside Property (Tract C) which is maintained, but not developed. This property is held by petitioner as a buffer for the Club against other developments. The gain realized on the sale was $ 2,330,889, which was not recognized or reported during the taxable year ended March 31, 1985. The proceeds were applied to the renovation of the clubhouse and construction of the tennis center within 3 years after the sale. The clubhouse and tennis center are used directly in the performance of petitioner's exempt function. In return for hosting the two professional golf tournaments, petitioner received a percentage of income from admissions, program advertising and program sales, and all of the income from food and beverage sales, parking, and other sources of tournament income. Petitioner was required, as a condition to hosting the 1981 P.G.A. Championship tournament, to maintain, recondition, and remodel its golf course in accordance with P.G.A. directives. In connection with hosting this tournament, petitioner was required: (1) To repair the irrigation system, (2) to repair *106 the golf cart paths damaged by television equipment trucks during the tournament, (3) to construct a parking lot adjacent to the golf course for tournament spectators, (4) to construct a new practice green, (5) to redesign six golf course greens on the Highland course, and (6) to rework the drainage system. The costs for these repairs and renovations totaled $ 576,197, which were incurred during the taxable year ended March 31, 1982. Petitioner also hosted 23 amateur nonmember golf tournaments and a number of amateur nonmember tennis tournaments during the years in issue. These tournaments were generally held on Monday, the day the Club was closed, and are referred to as "Monday outings." Greens fees and cart rentals in the golf area account for a substantial portion of the income from Monday outings. Income from Monday outings was also derived from user fees for the tennis, athletic, and aquatic centers. The prices charged by the Club for Monday outings were set at levels necessary to produce a profit to the Club after direct expenses were subtracted from the gross receipts associated with the Monday outings. Petitioner sold food and beverage items to nonmembers during the *107 various undertakings. Petitioner's prices for food and beverage items sold to nonmembers were the same as its prices for such items sold to members. The prices charged for food and beverage items sold to nonmembers were set at levels necessary to produce a gross profit to the Club after direct expenses were subtracted from gross receipts associated with the undertaking. Income and expenses from food and beverage sales during the 1976 U.S. Open and the 1981 P.G.A. Championship tournaments were reported separately from other food and beverage sales to nonmembers in other undertakings on petitioner's Forms 990-T. As long as an undertaking generated revenue in excess of its direct costs, petitioner realized a benefit from the positive cash flow. Direct expenses of an undertaking are those which increase in direct proportion to the volume of that undertaking. Each dollar of direct expense is traceable to a particular undertaking and would not have been incurred but for that undertaking. Indirect expenses of an undertaking are those which are not traceable to that undertaking. Indirect expenses include overhead and fixed expenses. Fixed expenses, such as property taxes and depreciation, *108 are incurred whether or not there is an undertaking. Many of petitioner's fixed expenses relate to maintenance and minimum staff requirements of operating its facilities. Overhead includes utilities, general administration, and clubhouse expenses. Petitioner incurred both direct and indirect expenses in all of its undertakings. For the taxable years in issue, an allocable portion of petitioner's indirect expenses was attributable to and directly connected with the generation of income in its undertakings. For purposes of computing unrelated business taxable income, petitioner consistently deducted an allocable portion of the indirect expenses as well as the direct expenses associated with the production of such income. In computing the allocable portion of indirect expenses deductible from petitioner's unrelated business taxable income on its Forms 990-T, petitioner allocated indirect expenses based on the ratio that sales from all undertakings bore to total sales of the Club. [2] This method is referred to as the gross-to-gross method. *109 Petitioner prepared an Analysis of Direct and Indirect Expenses Related to Non-Member Activities for the taxable years ended March 31, 1975, through March 31, 1986. Petitioner allocated revenues and direct and indirect expenses to three categories: Food and beverage sales to nonmembers, hosting Monday outings, and hosting the 1976 U.S. Open and the 1981 P.G.A. Championship tournaments. On its books and records, petitioner did not allocate general administrative expenses to the three categories. [3]
Petitioner kept a complete and accurate set of books and records of its undertakings. Petitioner's undertakings were overseen by the Board which consists of business and professional people from various backgrounds. The Board supervises and reviews the actions of the full-time general manager who controls the undertakings and implements Board policy on a day-to-day basis. *110 During the taxable years in issue, James E. Petzing was the general manager of the Club. As the chief operating officer of the Club, Mr. Petzing was responsible for operations, financial results, and member satisfaction. During the taxable years in issue, and the taxable years from which certain loss carrybacks are disallowed in the notice of deficiency, some of petitioner's unrelated business taxable income was derived from investments resulting in interest income on certificates of deposit and savings accounts. In each of the taxable years ended March 31, 1975, through March 31, 1986, except the taxable year ended March 31, 1982, a loss (excess expenses over income) resulted when the net income or net loss from each undertaking was aggregated. Petitioner reported such losses on its Forms 990-T. For the taxable year ended March 31, 1982, income from hosting the 1981 P.G.A. Championship tournament was sufficient to produce a gross profit after deduction of direct expenses and produced a net profit after deduction of indirect expenses. In each of the taxable years ended March 31, 1975, through March 31, 1986, income from Monday outings and nonmember tournaments, excluding the *111 1976 U.S. Open and the 1981 P.G.A. Championship tournaments, was sufficient to produce a gross profit after deduction of direct expenses but produced a net loss after deduction of indirect expenses. In each of the taxable years ended March 31, 1975, through March 31, 1986, income from food and beverage sales to nonmembers was sufficient to produce a gross profit after deduction of direct expenses but produced a net loss after deduction of indirect expenses. In the notice of deficiency, respondent determined that petitioner's undertakings, excluding the 1981 P.G.A. Championship tournament and investment income, produced losses after subtracting both direct and indirect expenses from the income of such undertakings. Respondent disallowed those losses for the years in issue. In the notice of deficiency, respondent included in petitioner's unrelated business taxable income for the taxable years in issue interest income and the income from hosting the 1981 P.G.A. Championship tournament, but disallowed the deductions claimed by petitioner for losses on petitioner's other undertakings. Respondent also disallowed petitioner's loss carryovers from such prior years for losses similar *112 to the losses claimed in the years in issue, net of investment income and income from the 1976 U.S. Open tournament. In its taxable year ended March 31, 1981, petitioner realized a capital loss in the amount of $ 85,793 upon the sale of a portion of its irrigation system. Petitioner determined that $ 12,045 of such capital loss was allocable to petitioner's undertakings and deducted such amount in computing its unrelated business taxable income for such taxable year. Petitioner and respondent stipulate that the portion of the capital loss of $ 85,793 allocable to petitioner's nonmember Monday outings and tournaments is $ 12,045. Respondent disallowed this loss in its entirety in the notice of deficiency. In the notice of deficiency, respondent disallowed petitioner's deduction in the amount of $ 265,032.81 for the taxable year ended March 31, 1982, after determining that the expenditures incurred to redesign the greens, to construct a new practice green, and to rework the drainage system are capital expenditures. In the notice of deficiency, respondent also included in petitioner's unrelated business taxable income for the taxable year ended March 31, 1985, gain in the amount *113 of $ 2,330,889 realized by petitioner upon the sale of Tracts A and B. OPINION Issue 1. The Loss Issue
Petitioner is exempt from Federal income tax under section 501(c)(7). [4] *114 However, section 511 provides that the unrelated business taxable income of organizations described in section 501(c) shall be taxed at the ordinary corporate rate. Section 512(a)(3)(A) provides that: In the case of an organization described in paragraph (7), * * * of section 501(c), the term "unrelated business taxable income" means the gross income (excluding any exempt function income), less the deductions allowed by this chapter which are directly connected with the production of the gross income (excluding exempt function income), both computed with the modifications provided in paragraphs (6), (10), (11), and (12) of subsection (b). * * * [5]
Recently, the United States Supreme Court decided Portland Golf Club v. Commissioner, 497 U.S. 154, 110 S. Ct. 2780, 111 L. Ed. 2d 126 (1990), affg. 876 F.2d 897 (9th Cir. 1989), revg. and remanding without opinion T.C. Memo 1988-76. In Portland Golf Club, the Supreme Court held "that any losses incurred as a result of [the taxpayer's] nonmember sales may be offset against its investment income only if the nonmember sales were undertaken with an intent to profit." [6]Portland Golf Club v. Commissioner, 110 S. Ct. at 2790. The Supreme Court also held that "in demonstrating the requisite profit motive, [the taxpayer] must employ the same method of allocating fixed *115 expenses as it uses in calculating its actual loss." Portland Golf Club v. Commissioner, 110 S. Ct. at 2790. *116 In Portland Golf Club, the taxpayer was required to demonstrate an intent to earn gross receipts in excess of indirect expenses (fixed expenses) and direct expenses (variable expenses) with an applicable share of the indirect expenses being determined by an allocation method where indirect expenses are used in computing its actual profit or loss. Where the intent to profit is not established, the taxpayer can only deduct indirect and direct expenses directly connected with the gross receipts up to the amount of gross receipts and cannot offset any resulting losses against its investment income. Before we can determine whether petitioner's undertakings were entered into with an intent to profit, we must address the parties' arguments with respect to whether it is appropriate to treat all of the undertakings as one activity or separate activities. Respondent characterizes petitioner's undertakings as three separate activities: (1) Two professional golf tournaments (the 1976 U.S. Open and the 1981 P.G.A. Championship tournaments), (2) Monday outings and amateur tournaments for nonmembers, and (3) food and beverage sales to nonmembers. Petitioner characterizes all of these undertakings *117 as one activity. Respondent maintains that the losses from the nonmember golf Monday outings and amateur tournaments and from the food and beverage sales cannot be used to offset the net income from the 1981 P.G.A. Championship tournament because these undertakings are separate and different activities using different parts of petitioner's club. Respondent points out that on petitioner's tax return, books and records, and financial statements for the taxable year ended March 31, 1982, petitioner separately accounted for the income and expenses of the 1981 P.G.A. Championship tournament. Petitioner seeks to combine the losses from all the undertakings and offset this loss against the net income from the 1981 P.G.A. Championship tournament. Petitioner argues that respondent's division of its undertakings into separate activities is improper. Petitioner argues that petitioner's undertakings represent the same source of income production and, consequently, the same undertaking or activity. Petitioner contends that the undertakings are similar, have a common business purpose, and have a high degree of organizational and economic interrelationship. Petitioner points out that all *118 of petitioner's undertakings consisted of making its clubhouse and recreational facilities and services available to nonmembers. As support for its position, petitioner refers to section 1.183-1(d)(1), Income Tax Regs., and 1.469-4T, Temporary Income Tax Regs., 54 Fed. Reg. 20528 (May 12, 1989).[7] Petitioner argues that there is nothing in the law to support respondent's position. Respondent contends that this Court and other courts have refused to combine separate undertakings or activities or to allow the expenses for one activity to be offset against the income of another activity, citing Ye Mystic Krewe of Gasparilla v. Commissioner, 80 T.C. 755, 765-767 (1983), and Iowa State University of Science & Tech. v. United States, 205 Ct. Cl. 339, 500 F.2d 508 (1974). Respondent argues that, in this case, the losses incurred from the *119 nonmember golf Monday outings and amateur tournaments and from the nonmember food and beverage sales, including banquets and wedding receptions, are not "directly connected" within the meaning of section 512(a)(3)(A) to the net income generated by the 1981 P.G.A. Championship tournament. Respondent also argues that petitioner has failed to meet its burden of proof to show that the separate undertakings should be combined as one activity. Respondent argues that petitioner's reliance on section 1.183-1(d)(1), Income Tax Regs., and section 1.469-4T, Temporary Income Tax Regs., is misplaced because these regulations are not applicable to nonprofit corporations. Respondent argues that the undertakings should not be treated as a single activity merely because they involved nonmembers. Respondent also argues that a professional golf tournament, which is awarded each year to different golf clubs is different from the nonmember Monday golf outings, amateur tournaments, and banquets which are regular and continuous activities of the Club. The professional tournament charges admission, is broadcast on television, attracts huge crowds, and adds prestige to the Club. According to respondent, *120 amateur tournaments are held as a public service; whereas, the professional tournament is held for the purpose of realizing substantial revenue and prestige for the Club. Petitioner argues that respondent's approach is incorrect. Petitioner argues that even though the 1981 P.G.A. Championship tournament drew more spectators and was more profitable than the other nonmember tournaments and events, the size and profitability of an event does not define it. According to petitioner, size and profitability are matters of degree, not of kind and, therefore, are not proper criteria for defining the scope of an activity. Petitioner maintains that the same business purpose, to make the Club more attractive to members and potential members, was served by hosting the 1981 P.G.A. Championship tournament and by hosting all the other undertakings. Petitioner points out that undertakings result in greater public exposure leading to higher ratings and prestige for the Club. Petitioner maintains that while the two professional tournaments are not held each year, they are a regular part of petitioner's undertakings and have a continuing impact on the Club's ongoing undertakings. According to *121 petitioner, all of the tournaments are an integral part of sports promotion and participation, the very purpose of the Club. Petitioner maintains that the professional and amateur golf tournaments are similar in function, purpose, and form. Respondent's reliance upon Ye Mystic Krewe of Gasparilla v. Commissioner, supra, to argue that this Court has refused to combine separate undertakings or activities is misplaced. In Ye Mystic Krewe of Gasparilla v. Commissioner, supra, this Court had to decide whether the expenses of an exempt activity could be offset against the income of a nonexempt function. We determined that the expenses of the exempt activity were not directly connected with the income of a nonexempt function, and, therefore, such expenses could not be offset against such income under section 512(a)(3)(A). We also determined that the purpose of section 512(a)(3) required that we treat the exempt activity and the nonexempt activity separately so that nonexempt function income could not be used to subsidize the exempt activities of the members. The opinion in Ye Mystic Krewe of Gasparilla v. Commissioner *122 , supra, is distinguishable from this case because petitioner, in this case, seeks to combine as one activity only nonexempt undertakings and to offset the losses from these undertakings against the net income of other nonexempt undertakings. The opinion in Iowa State University of Science & Tech. v. Commissioner, supra, is also distinguishable because in that case the taxpayer also sought to offset expenses of an exempt activity against unrelated income of a nonexempt activity. Even though respondent is correct that section 183 is inapplicable to a nonprofit corporation, section 1.183-1(d)(1), Income Tax Regs., does provide some guidance in determining what an activity is. See Portland Golf Club v. Commissioner, 497 U.S. 154, 110 S. Ct. 2780, 2787, 2790 nn.15, 22, 111 L. Ed. 2d 126 (1990). [8]Section 1.183-1(d)(1), Income Tax Regs., provides that all the facts and circumstances of a case must be taken into account in ascertaining what an activity is and provides that the most significant facts and circumstances are: the degree of organizational and economic interrelationship of various undertakings, the business purpose which is (or might be) served by carrying on *123 the various undertakings separately or together in a trade or business or in an investment setting, and the similarity of various undertakings. * * * We agree with petitioner that the undertakings have a common business purpose, to provide nonmember interest in the Club, and that the undertakings are economically interrelated. Petitioner did separate these undertakings in its books and records; however, we do not believe that that fact is sufficient alone to *124 justify treating each undertaking as a separate activity. We conclude that the undertakings constitute one activity for the purpose of determining whether petitioner entered into the activity with an intent to profit and for the purpose of determining whether the losses from one undertaking can be offset against the net income from another undertaking. We will now decide whether or not petitioner's activity was undertaken with a profit motive. Petitioner contends that the activity was entered into with an intent to profit. Petitioner presented various arguments in support of its position that it entered into the activity with an intent to profit. However, none of these arguments are relevant in light of the opinion of the Supreme Court in Portland Golf Club. Therefore, we will not discuss them. Respondent contends that the nonmember undertakings, excluding the 1981 P.G.A. Championship tournament, were not entered into with the intent to make a profit. Accordingly, respondent argues that petitioner may not offset losses from the undertakings against income from investments. In determining the actual profit or loss of the activity, petitioner subtracted both direct and indirect *125 expenses from gross receipts, where indirect expenses were allocated using the gross-to-gross method. This is the same allocation method used by the taxpayer in Portland Golf Club. Respondent has stipulated that the results of such a method in this case are reasonable. Therefore, under the test enunciated by the Supreme Court in Portland Golf Club, in order to prove that petitioner had an intent to profit in the activity, petitioner must establish that for each year in issue petitioner intended to earn net income from its activity. Net income is determined by subtracting the direct and indirect costs of that activity from the gross receipts of that activity, where indirect expenses are allocated using the gross-to-gross method. After applying the test in Portland Golf Club, a loss results for each year in issue except the taxable year ended March 31, 1982. The fact that petitioner incurred losses in 5 out of the 6 years in issue indicates that it is unlikely that petitioner intended to earn net income in the taxable year ended March 31, 1982. Thus, we conclude that petitioner did not enter into the activity with an intent to profit in any of the years in issue. *126 Therefore, we hold that petitioner is not entitled to offset the losses from the activity against its investment income for the years in issue. Respondent agrees with petitioner, that even without a profit motive, petitioner is entitled to deduct the expenses of each undertaking from the gross receipts of each undertaking. We have already decided that the undertakings constitute a single activity for the purposes of offsetting losses against gross receipts. Therefore, we conclude that petitioner is entitled to offset the losses from the activity against the net income from the activity for each year in issue. However, as decided earlier, petitioner may not deduct any excess losses from the activity against its investment income. Issue 2. The Capitalization Issue
Section 1.162-4, Income Tax Regs., provides that: The cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition, may be deducted as an expense, * * *. Repairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life of the property, shall *127 either be capitalized and depreciated in accordance with section 167 * * *.
Section 263(a) provides that "No deduction shall be allowed for -- (1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate." Section 1.263(a)-1(b), Income Tax Regs. provides that: amounts paid or incurred (1) to add to the value, or substantially prolong the useful life, of property owned by the taxpayer, such as plant or equipment, or (2) to adapt property to a new or different use. Amounts paid or incurred for incidental repairs and maintenance of property are not capital expenditures * * *
Section 1.263(a)-2(a), Income Tax Regs., provides that an example of a capital expenditure is "The cost of acquisition, construction, or erection of buildings, machinery and equipment, furniture and fixtures, and similar property having a useful life substantially beyond the taxable year." We must decide whether expenditures incurred to redesign six golf course greens, add a new practice green, and add a new drainage system in the total amount of $ 265,032.81 for the taxable year ended March 31, 1982, are expenses which are *128 deductible in the year the expenditures were incurred or are capital expenditures which must be capitalized. Petitioner argues that the redesign of six golf course greens by the Club to comply with P.G.A. requirements did not increase the value of any property beyond the period of the tournament, and, therefore, the expenditures are deductible as claimed. Petitioner maintains that the redesign of the greens was not desired by the membership, and such costs were incurred solely to receive income from hosting the tournament. Petitioner maintains that the useful life of the changes expired at the end of the tournament which is within the taxable year. Respondent argues that the expenditures are capital expenditures because the tournament renovations were permanent improvements and had useful lives greater than the taxable years in which they were constructed. Respondent points out that the record establishes that petitioner believed the renovations made the Club's golf course more valuable and added prestige because the renovations produced a golf course of professional championship calibre. Respondent maintains that petitioner has not established that the renovations have a useful *129 life or are depreciable under section 167, and, therefore, petitioner is not entitled to any depreciation deduction for the renovations. We agree with respondent. Petitioner did not restore the golf course to its original design immediately after the 1981 P.G.A. Championship tournament. In fact, petitioner waited until 1987 before redesigning the course. In 1987, not all of the greens that were redesigned for the tournament in 1981 were redesigned. The practice green was not changed. The evidence indicates that continuing drainage problems on the golf course were an important consideration in petitioner's decision to renovate the golf course in 1987. Petitioner often referred to these expenditures as permanent and capital expenditures. The evidence indicates that the renovations to the golf course had a useful life greater than the taxable year in which the expenses were incurred. Further, the renovations added value to the Club. We hold that the expenditures in the total amount of $ 265,032.81 incurred in the taxable year ended March 31, 1982, are capital expenditures under section 263(a). Issue 3. The Gain Issue
Petitioner asserts that Tracts A and B were used directly *130 in the performance of the exempt function of the Club. Respondent asserts that Tracts A and B were not used for pleasure or recreation, and that, instead, petitioner held the property for investment purposes. Therefore, according to respondent, the realized gain on the sale constitutes unrelated business taxable income. Section 512(a)(3)(D) provides that: If property used directly in the performance of the exempt function of an organization described in paragraph (7), * * * of section 501(c) is sold by such organization, and within a period beginning 1 year before the date of such sale, and ending 3 years after such date, other property is purchased and used by such organization directly in the performance of its exempt function, gain (if any) from such sale shall be recognized only to the extent that such organization's sales price of the old property exceeds the organization's cost of purchasing the other property. * * *
The parties agree that, within 3 years after the sale of Tracts A and B, petitioner reinvested the funds into facilities on the Eastside Property and such facilities are used directly for exempt functions. We must decide whether petitioner used Tracts *131 A and B directly in the performance of its exempt function. If petitioner used Tracts A and B for the pleasure and recreation of its members, then the gain from the sale of Tracts A and B shall be recognized only to the extent that the sale price of the property exceeded petitioner's cost of purchasing the other property. If petitioner did not use Tracts A and B for its exempt functions, petitioner must realize and recognize the gain from the sale of Tracts A and B in full. Petitioner purchased the Westside Property as part of a single transaction. Petitioner maintains that the entire Property was purchased and actually used as the site for the Club's golf course, clubhouse, and other recreational facilities, or exempt functions. Petitioner maintains that, at the time of the purchase, petitioner believed that both the Westside and Eastside Properties would be required for future development and that no land was purchased for speculation. Petitioner points out that in 1967, when club members inquired whether any of the Property was for sale, petitioner responded that no property was for sale. Petitioner maintains that the Club considered making improvements on the Westside Property *132 but abandoned these plans only after the traffic situation on Highway 141 worsened. Petitioner relies on the testimony of various members and Board members of the Club to establish that activities were held on Tracts A and B. Testimony from various members of the Club indicates that during the years prior to the sale, the type of activities that took place on the Westside Property included: Easter-egg hunts, pasture parties that involved bonfires, hot dog cookouts, marshmallow roasts for the kids, hot-air balloon rides, kite-flying contests, fishing, running, jogging, other sporting activities, and all types of participatory functions for the members. Respondent maintains that when Congress referred to property used directly in the performance of an exempt function, Congress meant that "the property was in actual, direct, continuous, and regular usage for exempt purposes rather than property that is maintained for its appreciating value and used only once or twice a year, if at all." Respondent argues that the evidence establishes that petitioner considered the Westside Property as a valuable asset, that the Westside Property remained undeveloped for 20 years, that no capital improvements *133 were considered for the Westside Property from 1964 until the time Tracts A and B were sold in 1984, and that the Club actually held only a few activities a year on Tract C. Respondent relies on contemporaneous Club records from 1964 to 1984, including the monthly newsletter "Club Times," to document what activities actually took place on Tracts A and B. In response to respondent's argument, petitioner argues that the fact that Tracts A and B were used less extensively than Tract C is irrelevant. According to petitioner, section 512(a)(3)(D) does not prescribe any requisite level of use. Therefore, as long as Tracts A and B were used directly for exempt functions, petitioner argues that the gain on the sale of Tracts A and B should go unrecognized under section 512(a)(3)(D). During the years petitioner owned Tracts A and B, petitioner's intentions with regard to the potential use of Tracts A and B appear to have included both investment uses and exempt function uses. The Westside Property was often referred to as a valuable asset or a good investment. When the Property was purchased, the Board admitted that the Club purchased more property than would be needed for future development, *134 but the Board wanted to hold onto the Westside Property as a valuable asset. Petitioner even considered building housing on the Westside Property at one point. Later, petitioner decided that the Westside Property would be used for recreation or Club purposes. However, section 512(a)(3)(D) does not require that we establish what the intent of petitioner was. Instead, section 512(a)(3)(D) requires that petitioner directly use Tracts A and B for exempt functions prior to its sale. The record establishes that Tracts A and B were not used directly in the performance of the Club's exempt functions. A review of the evidence indicates that most of the fishing tournaments, pony rides, Easter-egg hunts, and turkey trot races were held on the Eastside Property. There is no evidence other than the testimony offered by members of the Club as to the location of the hot-air balloon rides. The kite-flying contests were held on the Eastside Property and on Tract C. Tracts A and B were used for nonmember parking during the two professional golf tournaments, both nonexempt functions. The evidence indicates that pasture parties or picnics were held directly "across the roadside," or on Tract *135 C. The turkey trot races were held on the Eastside Property and Tract C. Invitational road races were held on the roads or on the golf course on the Eastside Property. The Club attempted to construct a jogging trail on Tract C and part of Tract B. However, the trail was abandoned. Members ran on the golf course, and in 1983, a running trail was constructed on the Eastside Property. Petitioner claims that Tracts A and B were used to grow trees or was a source of top soil and pulpwood. However, the evidence indicates that most of the landscaping was performed by outside contractors. In light of the evidence, we are not convinced from the testimony of members that the Club held activities on Tracts A and B. The only activities which may have occurred on Tracts A and B were running and jogging. We believe that this activity was not an activity directly sponsored by the Club as part of its exempt function. Instead, it appears that many of the members used Tracts A and B independently of the Club's programs. Such activity is not sufficient to establish that the Club directly used Tracts A and B for exempt functions. We hold that petitioner must recognize and report the gain *136 in the amount of $ 2,330,889 from the sale of Tracts A and B as unrelated business taxable income for the taxable year ended March 31, 1985. Decision will be entered under Rule 155. Footnotes
1. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue.↩
2. Respondent objected to the propriety of petitioner's allocation method, but stipulated that the results of such method of allocation in this case are reasonable. Respondent used other methods when performing the audit and came out with roughly the same results.↩
3. Respondent objected to this method of allocation, but stipulated that the method of allocation was reasonable for the same reasons stated in n. 2.↩
4. Section 501(a) provides that "An organization described in subsection (c) or (d) or section 401(a) shall be exempt from taxation under this subtitle unless such exemption is denied under section 502 or 503." Section 501(c)(7) provides that "Clubs organized for pleasure, recreation, and other nonprofitable purposes, substantially all of the activities of which are for such purposes and no part of the net earnings of which inures to the benefit of any private shareholder."↩
5. Section 512(a)(3)(B) defines exempt function income as: gross income from dues, fees, charges, or similar amounts paid by members of the organization as consideration for providing such members or their dependents or guests goods, facilities, or services in furtherance of the purposes constituting the basis for the exemption of the organization to which such income is paid. * * *↩
6. The Supreme Court stated that section 512(a)(3)(A) limits deductions from unrelated business taxable income to expenses allowable as deductions under Chapter 1 of the Internal Revenue Code. Therefore, the deductions claimed by the taxpayer were allowable only under section 162. Section 162 provides a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." The Supreme Court has ruled that a taxpayer's activities fall within the scope of section 162 only if an intent to profit has been shown. Commissioner v. Groetzinger, 480 U.S. 23, 35, 94 L. Ed. 2d 25, 107 S. Ct. 980 (1987). In Portland Golf Club v. Commissioner, 497 U.S. 154, 110 S. Ct. 2780, 2787, 111 L. Ed. 2d 126 (1990), the Supreme Court stated that investment income of a social club should be subject to the same tax consequences as for any other taxpayer. Therefore, losses from another nonexempt activity could not offset investment income unless the nonexempt activity was entered into by the taxpayer with an intent to profit, as required under section 162. Portland Golf Club v. Commissioner, supra↩ at 2787.
7. These regulations provide the definition of an activity for purposes of section 183 and section 469, respectively.↩
8. Even though section 183 is inapplicable to nonprofit corporations, the Supreme Court referred to the regulations promulgated thereunder as guidance for determining whether the taxpayer had engaged in an activity for profit. Petitioner also suggested we look to section 1.469-4T, Temporary Income Tax Regs., 54 Fed. Reg. 20528↩ (May 12, 1989), for the definition of an activity. If we were to apply such a definition, the only result would be to combine all of petitioner's nonmember undertakings, except investment income, into one activity.