ATLANTA ATHLETIC CLUB,
Petitioner–Appellant,

v.

COMMISSIONER OF INTERNAL
REVENUE SERVICE,
Respondent–Appellee.

No. 91–9047.

United States Court of Appeals,
Eleventh Circuit.

Jan. 11, 1993.

Terence J. Greene, Timothy J. Peaden, Sidney O. Smith, Jr., Frazer Durrett, Jr., Alston & Bird, Atlanta, Ga., for petitioner-appellant.

Gary R. Allen, Chief, Steven W. Parks, Brian C. Griffin, Robert S. Pomerance, Appellate Section, Tax Div., U.S. Dept. of Justice, Washington, D.C., for respondent-appellee.

Before FAY and COX, Circuit Judges, and HENDERSON, Senior Circuit Judge.

COX, Circuit Judge:

Atlanta Athletic Club (the "Club") appeals a United States Tax Court ruling that the Club must recognize and report as unrelated business taxable income a $2.3 million gain from the sale of land. The Club argues that the gain qualifies for nonrecognition under I.R.C. § 512(a)(3)(D) (West Supp.1992) because the Club used the property for its members' recreation and reinvested the sale proceeds in recreational facilities. The Tax Court found that the Club did not directly use the property for recreation within the meaning of § 512(a)(3)(D). *Atlanta Athletic Club v. Commissioner*, 61 T.C.M. (CCH) 2011, 2019 (1991). Thus, according to the Tax Court, nonrecognition was unavailable under the statute. We find that the Club directly used the property for recreation, and we reverse the Tax Court's ruling.

## BACKGROUND

The Club is a private social organization that owns and operates recreational facilities for members and their guests. It is exempt from federal income tax as a social club under I.R.C. § 501(c)(7) (West Supp. 1992).

In 1964 the Club bought 617.1 acres of land at its present location in northern Fulton County, Georgia. A highway divided the property into a 425.6–acre eastern tract (the "Eastside Property") and a 191.5–acre western tract (the "Westside Property"). The Club held all of the land for two decades before selling 108 acres of the Westside Property in 1984.

From the start, the Eastside Property was the hub of the Club's activities. It is there that the Club built its golf courses, clubhouse, swimming pool and tennis courts. On the other hand, the Club did little to develop the Westside Property across the highway. The Club constructed a slag road on the Westside Property in 1976 to accommodate public and member parking for a professional golf tournament. After the tournament, Club members began jogging on the slag road. The Club also built a jogging track with a pine bark surface on the Westside Property, but drainage problems quickly forced members to abandon the track. The Club once stocked a lake on the Westside Property with fish. Other than mowing grass in the open areas, the Club made no other effort to improve the Westside Property for recreational uses.

When it decided to sell part of the Westside Property, the Club for the first time divided the parcel into three tracts: A, B and C. The 1984 sale of the 108 acres in tracts A and B brought the Club a $2.3 million gain. The Club retained tract C.

The parties have stipulated that the Club spent its $2.3 million gain to construct a new tennis center and renovate the clubhouse on the Eastside Property. The money was reinvested within the time limits specified by § 512(a)(3)(D).[1]

The Club deferred payment of income tax on the gain for its taxable year that

---

1. The statute provides, in pertinent part:

 **(D) Nonrecognition of gain.—** If property used directly in the performance of the exempt function of an organization … is sold by such organization, and within a period beginning 1 year before the date of such sale, and ending 3 years after such date, other property is purchased and used by such organization directly in the performance of its exempt function, gain (if any) from such sale shall be recognized only to the extent that such organization's sales [sic] price of the old property exceeds the organization's cost of purchasing the other property.

 I.R.C. § 512(a)(3)(D) (West Supp.1992).

ended March 31, 1985, in the belief that § 512(a)(3)(D) allowed nonrecognition of the full amount. The Commissioner of Internal Revenue (the "Commissioner") disagreed. The Commissioner determined that the nonrecognition provision did not apply because the Club did not directly use tracts A and B for the Club's exempt function (i.e., the pleasure and recreation of Club members). Treating the $2.3 million gain as unrelated business taxable income, the Commissioner assessed a $658,063 deficiency against the Club.[2] The Club petitioned the Tax Court to redetermine the deficiency.

Club members and employees testified before the Tax Court that the Westside Property was the site of a number of activities through the years. Among the events were "pasture parties," Easter egg hunts, fishing tournaments, kite-flying contests, hot-air balloon rides and organized foot races.[3] Many members jogged on the property, and some members used the area for archery practice and to fly model airplanes.

To counter this testimony, the Commissioner relied largely on the Club's monthly newsletters and other documents from the 1970s and 1980s. The Commissioner argued that some of the organized events described by the Club's witnesses were held either on the Eastside Property or on the portion of the Westside Property retained by the Club, not on tracts A and B.[4]

The Tax Court ruled in favor of the Commissioner, stating that it was "not convinced" by the testimony of the Club's witnesses. *Atlanta Athletic Club*, 61 T.C.M. (CCH) at 2019.[5] The Tax Court determined that, at most, individual members merely jogged across tracts A and B on their own initiative. *Id.* Jogging "was not an activity directly sponsored by the Club as part of its exempt function." *Id.* Therefore, "[s]uch activity [was] not sufficient to establish that the Club directly used Tracts A and B for exempt functions." *Id.*

## ISSUE

The issue before this court is whether the Tax Court erred in finding that tracts A and B of the Westside Property were not "used directly" by the Club, within the meaning of I.R.C. § 512(a)(3)(D), to provide pleasure and recreation for Club members.

## STANDARD OF REVIEW

 The Tax Court's determination of the activities that took place on the Westside Property are factual findings that we will not disturb unless clearly erroneous. *See* 26 U.S.C.A. § 7482(a) (West Supp. 1992); Fed.R.Civ.P. 52(a). A finding of fact is clearly erroneous "if the record lacks substantial evidence to support it," *Thelma C. Raley, Inc. v. Kleppe*, 867 F.2d

---

**2.** The Club's unrelated business income is taxable under 26 U.S.C.A. § 511(a) (West Supp. 1992). "Unrelated business taxable income" is basically the Club's gross income from sources other than membership dues and fees, less any allowable deductions directly connected to production of the gross income. *Id.* § 512(a)(3)(A).

**3.** The general manager of the Club at the time of the Tax Court hearing, Allan Christopher Borders, said annual pasture parties that began in the late 1970s were held on what was later designated as tract A. Borders said kite-flying contests each spring were always held on tract A. Club member Lewis E. Reeves said an annual "5K" (3.1–mile) run took contestants across all three tracts, although the start and finish were on tract C. Reeves said he was in charge of the kite-flying contest one year, and that it was held on tract A. The Club's athletic director, Wiley R. McGriff, testified that an annual one-mile run for children crossed from tract

C into tract A. McGriff recalled pasture parties on tract A. James E. Petzing, a former general manager of the Club, said fishing tournaments were held at the lake on tract A for four or five years in the early 1970s.

**4.** For example, newsletters from 1977 and 1979 announced an Eastside Property location for pony rides at the Club's annual Easter event. Newsletters from 1983 and 1984 announced fishing contests on the Eastside Property, as did newsletters from years after the Westside Property was sold. In 1983 the Club's board approved holding that year's "Turkey Trot" foot race on the Eastside Property, not the Westside Property.

**5.** The Tax Court also sustained other deficiencies determined by the Commissioner with regard to Club transactions unrelated to the property sale. The Club has not appealed the Tax Court's decision on the other deficiencies.

1326, 1328 (11th Cir.1989), so that our review of the entire evidence leaves us "with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *see also Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *Gypsum*). The Tax Court's interpretation and application of § 512(a)(3)(D) are conclusions of law that we review de novo. *Young v. Commissioner*, 926 F.2d 1083, 1089 (11th Cir.1991).

## DISCUSSION

■ This is a case of first impression in our circuit. We find no guidance from other circuits, either: no reported case resolves a similar dispute under the terms of § 512(a)(3)(D).

The statute speaks in terms of use rather than intent. Therefore, the Tax Court correctly observed that the Club's various plans for the land were irrelevant. *Atlanta Athletic Club*, 61 T.C.M. (CCH) at 2019. The analysis must concentrate on the ways in which the Westside Property was or was not "used directly." This process entails factual findings as to the activities that occurred on tracts A and B of the Westside Property, and legal conclusions as to whether those activities constituted sufficient recreational uses by the Club.

After hearing the Club's witnesses and reviewing the documentary evidence, the Tax Court found as a fact that "[t]he only activities which may have occurred on Tracts A and B were running and jogging." *Id.* In reaching this conclusion, the Tax Court disregarded significant portions of the testimony from the Club's witnesses. The Tax Court stated that, "[i]n light of the evidence," it was "not convinced from the testimony of members that the Club held activities on Tracts A and B." *Id.*

We do not read the Tax Court's "not convinced" remark to mean that the court rejected all testimony by the Club's various witnesses as incredible. The Tax Court accepted the same witnesses' testimony that many members individually used the property. *See id.* If the Tax Court did discount extensive portions of the testimony, it articulated no reasons for rejecting such testimony as incredible and none are apparent from the record. Most of the testimony about specific activities on tracts A and B conflicts with nothing in the documentary evidence, and the Commissioner called no witnesses to dispute the recollections of the Club's witnesses. The following examples illustrate that key aspects of the testimony were unchallenged:

—Witnesses said the annual "Turkey Trot" foot races traversed tracts A, B and C. This testimony was contradicted only as to the 1983 run. A 1979 newsletter gave the location as "across the entrance from the clubhouse," indicating the Westside Property. (Joint Exh. 118DN at 12.) Announcements of the Turkey Trot races in other years specified no location.

—Witnesses stated repeatedly that kite-flying contests were held on tract A. Announcements in the Club's newsletters said simply that the contests would be conducted "across the entrance drive" or "opposite the cluhouse [sic] on Hwy. 141," again referring to the Westside Property. (Joint Exhs. 146EP at 5, 157FA at 6.)

—Witnesses said the Club's annual pasture parties were held on tract A before it was sold. Newsletters indicated that pasture parties were held "outdoors and across the roadside," a reference to the Westside Property. (Joint Exhs. 153EW at 5, 165FI at 3.) A pasture party announcement after the 1984 sale also gave the location as "outdoors and across the roadside." (Joint Exh. 189GG at 5.) This post–1984 announcement could not have been referring to tracts A and B. Nevertheless, because the entire Westside Property was viewed as one tract prior to the sale, the pre–1984 newsletters do not contradict the witnesses' testimony about the earlier parties.

—As the Tax Court itself noted, the record contains "no evidence other than the testimony offered by members of

the Club as to the location of the hot-air balloon rides." *Atlanta Athletic Club,* 61 T.C.M. (CCH) at 2019. The Club's general manager testified that balloon rides were held on tract A.

—The Club's former general manager said fishing contests were held at the lake on tract A for four or five years in the 1970s. Newsletters cited by the Commissioner indicate that fishing tournaments from 1983 through 1987 were held on the Eastside Property; the newsletters say nothing about tournaments during the 1970s.

—The Tax Court acknowledged that the Club built a pine-bark jogging track on tracts B and C, although the track later was abandoned. *Id.*

—Witnesses testified, and the Tax Court found as a fact, that a number of Club members regularly jogged along the slag roads on tracts A and B. We disagree with the Tax Court's characterization of jogging as "not an activity directly sponsored by the Club." *Id.* Although the Tax Court did not explain what it meant by sponsorship, we see no reason to view jogging differently from other Club activities. The record establishes that the Club made available the Westside Property for jogging by members. The unsuccessful attempt to maintain a pine-bark track on the property shows that the Club actually encouraged such use. As with swimming and golfing by individual members on the Eastside Property, jogging need not be organized by the Club in order to be sponsored by it.

The Commissioner complains that "[m]uch of the testimony ... suffered from a lack of precision concerning where the activities were conducted." (Appellee's Br. at 29.) While it is true that some testimony was vague, the Club's witnesses frequently were quite specific about locations as they testified with the aid of a chart that delineated the three tracts. For example, the Tax Court remarked during the hearing that one witness had related "activities that were—that took place on tract A on this exhibit." (R.1–1 at 56.)

It is also true that the announcements in the Club's newsletters—on which the *Commissioner* relied—were not precise as to whether activities were held on what later became tracts A, B or C. As one witness explained, before the 1984 sale the entire Westside Property was commonly referred to as "the property across the road." (R.1–1 at 193.) The Commissioner contends that such a general description "denotes" or "suggests" tract C rather than tracts A or B. (Appellee's Br. at 31–32 n. 10.) Nevertheless, the Commissioner's unsupported interpretation of the references in the newsletters cannot alone refute the sworn testimony of the Club's witnesses.

Because nothing in the record contradicts the Club's evidence in many significant respects, we are left with a definite and firm conviction that the Tax Court mistakenly determined that no Club-sponsored events occurred on what eventually became known as tracts A and B. We hold that the Tax Court clearly erred in this regard.

We begin our interpretation of a statute with "the plain language of the statute itself." *Rosewell v. LaSalle Nat'l Bank,* 450 U.S. 503, 512, 101 S.Ct. 1221, 1228, 67 L.Ed.2d 464 (1981). "Absent unusual circumstances we are bound by the plain meaning of the language Congress has enacted." *Hills v. Commissioner,* 691 F.2d 997, 1000 (11th Cir.1982). The plain language at issue here consists of the words "used directly." The statute does not define "used directly," and the words are not terms of art. Finding no unusual circumstances, "we are not at liberty, notwithstanding the apparent tax-saving windfall bestowed upon taxpayers, to add to or alter the words employed to effect a purpose which does not appear on the face of the statute." *Hanover Bank v. Commissioner,* 369 U.S. 672, 687, 82 S.Ct. 1080, 1089, 8 L.Ed.2d 187 (1962).

The Commissioner seeks to equate direct use with dominant use. According to the Commissioner, "[i]ncidental use of the property for a club-sponsored function, or by club members for recreational pursuits of their own, would not satisfy the language or purpose of Section 512(a)(3)(D)."

(Appellee's Br. at 27–28.) Even if all of the activities listed by the Club's witnesses occurred on the property in question, the Commissioner would deny nonrecognition because "the dominant if not exclusive use of that unimproved land was for investment." (*Id.* at 27.) There are two problems with the Commissioner's approach: First, whether the Club ever planned to hold the Westside Property as an investment goes to the Club's intentions rather than to any actual uses of the property. Second, the statute in no way qualifies the concept of direct use to require that such use be dominant as well as direct.

The Commissioner has offered other, slightly varying interpretations of the statute. Before the Tax Court, the Commissioner contended that "used directly" means " 'in actual, direct, continuous, and regular usage.' " *Atlanta Athletic Club*, 61 T.C.M. (CCH) at 2019. The statute, however, says nothing about continuity or regularity. On this appeal, the Commissioner argues that nonrecognition under § 512(a)(3)(D) "is available only for gain realized from the sale of property, such as a clubhouse, tennis court, swimming pool, or golf course, that forms an integral part of the exempt functions of a social club." (Appellee's Br. at 21.) Once again, the Commissioner would qualify the statute's plain language. Moreover, the Commissioner offers no objective standard for determining which activities are "integral" to a social club's broad function to provide for the pleasure and recreation of its members. It is certainly conceivable that joggers derive as much pleasure and recreation from their pastime as golfers do from their rounds on the links.

The Commissioner's references to *Framingham Country Club v. United States*, 659 F.Supp. 650 (D.Mass.1987), provide no insights into the problem at hand. The district court in *Framingham* decided the dispute before it by ruling that the lapse of an option is not a "sale" for purposes of nonrecognition under § 512(a)(3)(D). *Id.* at 653. The court went on to remark in dicta that the country club's use of property only as a storage area and as a residence for the club's grounds keeper would not have con-stituted direct recreational uses by the club. *Id.* Unlike the present situation, no usage by members was alleged in *Framingham*. Thus, even the dicta has no bearing here.

In an attempt to overcome the statute's plain language, the Commissioner resorts to the legislative history of § 512(a)(3)(D). Specifically, the Commissioner cites a Senate Finance Committee report that illustrates the operation of § 512(a)(3)(D) by referring to the sale of a clubhouse and the reinvestment of the gain in a larger clubhouse. *See* S.Rep. No. 91–552, 91st Cong., 1st Sess., *reprinted in* 1969 U.S.C.C.A.N. 2027, 2102. By using a clubhouse as an example, however, the committee did not pretend to limit the statute's coverage in a way not apparent on the face of the statute itself. Likewise, the committee mentioned "securities" as an example of investment property that would produce a taxable gain for a social club. *Id.* at 2100. This does not mean that securities are the only type of income-producing property that would subject a club to the federal tax.

"[T]he law is well settled that a statute must be interpreted according to its plain language unless a clear contrary legislative intent is shown." *Alabama v. Marshall*, 626 F.2d 366, 368–69 (5th Cir.1980). We find nothing in the legislative history, much less any indication of a clear intent, to support the notion that the words in § 512(a)(3)(D) have other than their ordinary meaning.

The Commissioner warns that viewing the Club's "desultory activities" on the Westside Property as direct recreational uses would open the statute to abuse. (Appellee's Br. at 20.) Other organizations "would have an easy route to avoid tax on investment profits from real estate." (*Id.*) Nevertheless, Congress enacted this tax provision; if it is too generous, the power to tighten it also rests with Congress. As the old Fifth Circuit remarked about another tax law, "It may be that the statute gives an undeserved benefit to a particular class of taxpayers.... [But] [w]e can no more grant relief to the Government from

hardships than we could to a taxpayer." *Commissioner v. Mercantile Nat'l Bank,* 276 F.2d 58, 62–63 (5th Cir.1960).

### CONCLUSION

The Club bought tracts A and B with members' funds. Nothing in the record contradicts the bulk of the Club's evidence that the Club used the property for its members' pleasure and recreation. We hold that the Club's activities on the West-side Property constituted direct uses of the property for the pleasure and recreation of Club members within the meaning of § 512(a)(3)(D). The Club reinvested its gain from the sale of tracts A and B in other property that members also used for pleasure and recreation. The reinvestment occurred within a period beginning one year before and ending three years after the sale of tracts A and B. Therefore, under § 512(a)(3)(D), the Club's $2.3 million gain from the sale of the property should not be recognized for federal income tax purposes. We REVERSE the decision of the Tax Court.

REVERSED.