[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 13, 2010
JOHN LEY
CLERK

No. 09-13395

U.S. Tax Court No. 967-07

OCMULGEE FIELDS, INC.,

Petitioner,

versus

COMMISSIONER OF INTERNAL REVENUE,

Respondent.

_____

Petition for Review of a Decision of the
United States Tax Court

_____

(August 13, 2010)

Before TJOFLAT, WILSON and EBEL,  Circuit Judges.

EBEL, Circuit Judge:

_____
   *Honorable David M. Ebel, United States Circuit Judge for the Tenth Circuit, sitting by designation.

Although in most circumstances, a taxpayer must immediately recognize gains realized from the sale of his property, see 26 U.S.C. § 1001(c),[1] a taxpayer may receive nonrecognition treatment for gains realized from the disposition of property through a qualified like-kind exchange under § 1031(a).  Special rules, however, disallow nonrecognition treatment for certain like-kind exchanges that involve a related party, directly or otherwise.  See § 1031(f).  At issue in this case is § 1031(f)(4), which disallows nonrecognition treatment for any like-kind exchange that was "part of a transaction (or series of transactions) structured to avoid the purposes of" the special rules on related-party exchanges.  Appellant Ocmulgee Fields engaged in a like-kind exchange that interposed an intermediary between itself and a related party.  The IRS disallowed nonrecognition treatment, and, on review, the tax court agreed with the IRS, concluding that § 1031(f)(4) disallowed nonrecognition treatment for the exchange.  See Ocmulgee Fields, Inc. v. C.I.R., 132 T.C. 105, 122-23 (2009).  Exercising jurisdiction under § 7482(a)(1), we AFFIRM the tax court's order.

## BACKGROUND

As noted, Ocmulgee Fields engaged in a like-kind exchange that it believes should receive nonrecognition treatment under § 1031(a).  This exchange involved

---

[1] All statutory references made herein are to Title 26 of the United States Code unless otherwise noted.

four parties: (1) Ocmulgee Fields (the taxpayer); (2) Treaty Fields (a "related person")[2]; (3) the McEachern Family Trust (an unrelated purchaser of property); and (4) Security Bank of Bibb County ("Security Bank") (a qualified intermediary)[3]. Ocmulgee Fields and Treaty Fields were both real estate development and management companies.

If, for a brief moment, we ignore the fact that Ocmulgee Fields and Treaty Fields were "related" parties, the like-kind exchange at issue in this case took on a typical, albeit complex, form. See Joshua D. Rosenberg & Dominic L. Daher, The Law of Federal Income Taxation § 9.02[2][a] (2008) (discussing the use of intermediaries to facilitate exchanges). Ocmulgee Fields first conveyed its property, Wesleyan Station, to Security Bank. In turn, Security Bank then sold Wesleyan Station to the McEachern Family Trust. Next, Security Bank used the proceeds from the sale of Wesleyan Station to purchase the Barnes & Noble

---

[2] A "related person" is a term of art specifically defined by statute. § 1031(f)(3) (defining a "related person" as anyone with a relationship to the taxpayer as described in §§ 267(b) or 707(b)(1)). We need not wade into the depths of this detailed definition, however, because there is no dispute in this case that Ocmulgee Fields and Treaty Fields are "related" for purposes of their like-kind exchange. Although the statute uses the phrase "related person," we use the phrases "related person" and "related party" interchangeably.

[3] Like the term "related person," the term "qualified intermediary" is a term of art specifically defined by law, see 26 C.F.R. § 1.1031(k)-1(g)(4), but we need not address the specifics of that definition either because there is no dispute that Security Bank was a "qualified intermediary" for purposes of the exchange.

Corner property[4] from Treaty Fields.  Finally, Security Bank conveyed the Barnes & Noble Corner property to Ocmulgee Fields.  At the end of this series of transactions, then, Ocmulgee Fields (the taxpayer) held the Barnes & Noble Corner property as a replacement investment property for Wesleyan Station; the McEachern Family Trust (an unrelated purchaser) owned Wesleyan Station; Treaty Fields (a related person) no longer owned any investment property[5] and simply held the cash proceeds from its sale of the Barnes & Noble Corner property; and Security Bank (a qualified intermediary) held whatever fees Ocmulgee Fields had paid for its services in facilitating the exchange.  Because the taxpayer, Ocmulgee Fields, interposed a qualified intermediary, Security Bank, between itself and the related party, Treaty Fields, the like-kind exchange was technically between Ocmulgee Fields and Security Bank; the related party, Treaty Fields, was involved only indirectly.

Ocmulgee Fields entered into its Wesleyan Station sales contract with the McEachern Family Trust in July 2003.  The agreement required that the Wesleyan Station transaction close no later than October 10, 2003.  The sales agreement

---

[4] The Barnes & Noble Corner property actually consisted of three separate properties, but all parties have collectively referred to these properties as the Barnes & Noble Corner property. Accordingly, we do so as well.

[5] As a real estate development company, Treaty Fields likely owned other investment property, but for purposes of this exchange, it no longer held any of the investment property involved in the relevant transactions.

neither precluded Ocmulgee Fields from structuring its transaction as a like-kind exchange, nor conditioned the sale of Wesleyan Station to the McEachern Family Trust on Ocmulgee Fields' ability to find suitable replacement property. On October 9, Ocmulgee Fields enlisted Security Bank as a qualified intermediary, and the next day Security Bank conveyed Wesleyan Station to the McEachern Family Trust for the agreed-upon price of $7.25 million for the property.

Although it was not required by the Wesleyan Station sales contract, Ocmulgee Fields claims it wanted to engage in a like-kind exchange with a third party.[6] It apparently began its efforts to find a replacement property for Wesleyan Station, at least informally, even before it entered into the sales contract with the McEachern Family Trust.[7] Ocmulgee Fields enlisted the help of an accountant as well as real estate brokers, but nonetheless asserts that it could not find a suitable replacement property held by an unrelated party. It claims that it specifically considered and rejected five properties as unsuitable (each for a different reason); it

_____

[6] The statute imposes time-limits on identifying and acquiring a replacement property that reduce the amount of flexibility a taxpayer has to find and purchase replacement property. In order to qualify for nonrecognition treatment under § 1031(a), the taxpayer must identify the replacement property within 45 days of when he transfers his relinquished property. See § 1031(a)(3)(A). The taxpayer must also receive the replacement property by the earlier of 180 days after the transfer of the relinquished property or the due date of the transferor's tax returns for the taxable year in which the relinquished property is transferred. See § 1031(a)(3)(B)(i)-(ii).

[7] The McEachern Family Trust apparently either had no interest in engaging in a direct exchange with Ocmulgee Fields or lacked suitable replacement property to do so.

5

also rejected the idea of acquiring timber land as replacement property (though Ocmulgee Fields does not appear to have had any particular property in mind at that time).

On October 15, 2003—just six days after it enlisted Security Bank to convey Wesleyan Station to the McEachern Family Trust—Ocmulgee Fields had definitively settled on a replacement property: the Barnes & Noble Corner property owned by Treaty Fields.[8]  On that date, Ocmulgee Fields entered into a sales contract with Treaty Fields to purchase the Barnes & Noble Corner property through its qualified intermediary for just under $7 million.  The qualified intermediary subsequently purchased the property and transferred it to Ocmulgee Fields in early November.  Because the gross sales price of the Barnes & Noble Corner property was $6,740,900 and it had an adjusted basis of $2,554,901, Treaty Fields realized $4,185,999 from its sale of that property.  And because Treaty Fields is a partnership, it passed these gains through to its partners who were taxed on them at a 15% rate.

---

[8] In fact, the tax court made a finding of fact that as early as October 10, 2003, Ocmulgee Fields had a "prearranged plan" to acquire the Barnes & Noble Corner property to serve as its replacement property.  Ocmulgee Fields, Inc. v. C.I.R., 132 T.C. 105, at 122 n.6 (2009) (further finding that Ocmulgee Fields "had turned its attention exclusively to the Barnes & Noble Corner by Oct. 9, 2003, the day it engaged Security Bank as a qualified intermediary and 1 day before Security Bank sold Wesleyan Station" to the McEachern Family Trust on behalf of Ocmulgee Fields").

In contrast, in its tax return for the year ending in May 2004, Ocmulgee Fields identified its like-kind exchange with Security Bank as one that qualified for nonrecognition treatment under § 1031(a). Although the sales contract indicates that Ocmulgee Fields sold Wesleyan Station for $7.25 million, Ocmulgee Fields indicated in its tax return that it received only $6,838,900 for the property.[9] Because Wesleyan Station had an adjusted basis of $716,164, Ocmulgee Fields realized $6,122,736 from its disposition of Wesleyan Station. If Ocmulgee Fields had immediately recognized this gain, the gain would have been taxed at a 34% tax rate, see § 11, which would have yielded an immediate tax liability of over $2 million. But Ocmulgee Fields avoided this tax liability by claiming nonrecognition treatment and ultimately paid only $171,375 in taxes for the year.

The IRS issued a deficiency against Ocmulgee Fields, asserting that Ocmulgee Fields should have recognized the gains from the sale of Wesleyan Station and, consequently, incurred approximately $2 million in additional tax liability. The IRS asserted that Ocmulgee Fields failed to "establish[] that [it had] met all of the requirements of Section 1031(f) for nonrecognition of [the] gain" from its exchange with Security Bank. (R. v.2 Doc. No. 2 (Explanation of Adjustments).) The tax court reviewed the IRS' deficiency notice and agreed with

_____

[9] This discrepancy is not at issue on appeal and has no impact on our decision.

the IRS, concluding that the exchange was not entitled to nonrecognition treatment under § 1031(a) because § 1031(f)(4) disallowed nonrecognition treatment.  See Ocmulgee Fields, Inc., 132 T.C. at 106 (agreeing with the IRS "that section 1031(f)(4) requires recognition" of the gains derived from the sale of Wesleyan Station).  Ocmulgee Fields now appeals that decision.

## STANDARD OF REVIEW

We review a tax court's legal conclusions and interpretations of the tax code de novo.  Estate of Blount v. C.I.R., 428 F.3d 1338, 1342 (11th Cir. 2005).  However, we review its findings of facts and factual inferences, whether based on oral, documentary, or stipulated evidence, for clear error.  Id.; see also Fla. Progress Corp. & Subsidiaries v. C.I.R., 348 F.3d 954, 959-60 (11th Cir. 2003).  "A finding of fact is clearly erroneous if the record lacks substantial evidence to support it, so that our review of the entire evidence leaves us with the definite and firm conviction that a mistake has been committed."  Atlanta Athletic Club v. C.I.R., 980 F.2d 1409, 1411-12 (11th Cir. 1993) (quotations and citations omitted).

## DISCUSSION

The tax court concluded that § 1031(f)(4) disallowed nonrecognition treatment for Ocmulgee Fields' like-kind exchange with Security Bank.  Because our circuit has yet to address § 1031(f)(4), we begin with a discussion of the

8

statutory framework at issue before proceeding to the merits of Ocmulgee Fields'

appeal. For reasons discussed below, we affirm the tax court's conclusion that

§ 1031(f)(4) disallows nonrecognition treatment for the exchange at issue.

## I.      The Statutory Framework

When a taxpayer exchanges one property for another, the exchange is

typically treated for tax purposes as a sale of the relinquished property followed by

a purchase of the received property. See Alan Prigal & Mary Howley, Rabkin &

Johnson Federal Tax Guidebook § 42.02 (2010); see also Joshua D. Rosenberg &

Dominic L. Daher, The Law of Federal Income Taxation § 9.02. Consequently,

the taxpayer must immediately recognize the gains or losses realized from the

exchange. See § 1001(c).

If a taxpayer engages in a qualified like-kind exchange, however, the gains

or losses from that exchange receive nonrecognition treatment. See § 1031(a)(1)

("No gain or loss shall be recognized on the exchange of property held for

productive use in trade or business or for investment if such property is exchanged

solely for property of like kind which is to be held either for productive use in a

trade or business or for investment.").[10] In other words, the taxpayer incurs no

---

[10] The application of § 1031(a)'s nonrecognition treatment is mandatory if the exchange qualifies as a proper like-kind exchange. See Redwing Carriers, Inc. v. Tomlinson, 399 F.2d 652, 656 n.7 (5th Cir. 1968). Additionally, § 1031(b) limits nonrecognition treatment where the exchange involves more than merely property of like kind.

9

immediate tax consequences from the exchange because he need not immediately recognize any of the gains or losses that flow from it. Congress afforded nonrecognition treatment to § 1031(a) like-kind exchanges because it recognized that when a taxpayer merely exchanges one investment property for a similar investment property, the taxpayer has not cashed in on his investment but continued that investment, albeit in a different property. See Swaim v. United States, 651 F.2d 1066, 1069 (5th Cir. 1981) (explaining that although "in theory the taxpayer may have realized gain or loss, . . . in substance his economic interest in the property has remained virtually unchanged by the transaction") (quotations omitted); see also Starker v. United States, 602 F.2d 1341, 1352 (9th Cir. 1979) ("The legislative history [of § 1031(a)] reveals that the provision was designed to avoid the imposition of a tax on those who do not 'cash in' on their investments in trade or business property.").

Although Congress determined that immediate taxation for qualified like-kind exchanges was inappropriate, it sought to ensure that the gains or losses from the exchange did not escape future taxation. See The Law of Federal Income Taxation § 9.02[2][b] (noting that "several other provisions work in concert with section 1031 to ensure that whatever gain goes unrecognized as a result of section 1031 does not go untaxed in perpetuity"). Congress wanted to ensure that once the

10

taxpayer engaged in a subsequent, taxable disposition of the property (i.e., once the taxpayer cashed in on his investment), the taxpayer would then incur the tax consequences for the full gain or loss from his ongoing investment in that type of property.  See id.  To preserve the tax consequences from the ongoing investment where a taxpayer engages in a like-kind exchange, Congress provided that the basis of the taxpayer's relinquished property would carry over and become the basis of the replacement property he received in the exchange.  See § 1031(d); see also Teruya Bros., Ltd. v. C.I.R., 580 F.3d 1038, 1042 (9th Cir. 2009).

Prior to 1989, when Congress limited the availability of nonrecognition treatment, sophisticated taxpayers acted in concert to exploit the nonrecognition treatment and carry-over basis provisions to minimize their tax liability but still cash in on their investments.  See Teruya Bros., 580 F.3d at 1042.  By avoiding taxes through manipulative basis-shifting and nonrecognition treatment yet "cash[ing] in on their investments," these taxpayers undermined Congress' purpose for according nonrecognition treatment in the first instance.  See Starker 602 F.2d at 1352.

A hypothetical illustrates how two taxpayers acting in concert could exploit the system.  Suppose Alpha Co. owns Blackacre, an investment property which has a basis of $10,000 but is worth $20,000.  Alpha Co. is owned by Baker, who also

owns another business, Charlie Co., which owns its own investment property, Whiteacre. Like Blackacre, Whiteacre is worth $20,000, but Whiteacre has a higher basis of $18,000. Alpha Co. wants to cash in on its investment in Blackacre. Prior to 1989, Alpha Co. had two options that yielded very different tax consequences. Alpha Co. could have sold Blackacre outright. This approach would have required Alpha Co. to recognize $10,000 in taxable gain immediately. Alternatively, Alpha Co. could have exchanged Blackacre for Charlie Co.'s Whiteacre, and Charlie Co. could have then sold Blackacre to a third party. No immediate tax consequences would have resulted from Alpha Co. and Charlie Co.'s exchange because the gains or losses from that exchange would have received nonrecognition treatment. But, as a result of the carry-over basis provision intended to preserve future tax consequences, Alpha Co. would own Whiteacre with a basis of $10,000 and Charlie Co. would own Blackacre with a basis of $18,000. Consequently, when Charlie Co. then sold Blackacre, it would recognize an immediate gain of only $2,000 (as opposed to the $10,000 Alpha Co. would have recognized from an outright sale of Blackacre). Therefore, Alpha Co. and Charlie Co. could have acted in concert to cash in on the Blackacre investment property while minimizing their tax liability as a unit by exchanging a low-basis

property (Blackacre) for a high-basis property (Whiteacre) in anticipation of selling the low-basis property (Blackacre).[11]

In 1989, Congress sought to end a taxpayer's ability to act in concert with a related party to take advantage of this alternative approach. See Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, 103 stat. 2106, 2370-71 (1989); see also H. R. Rep. No. 101-247 at 1340 ("Because a like-kind exchange results in the substitution of the basis of the exchanged property for the property received, related parties have engaged in like-kind exchanges of high basis property for low basis property in anticipation of the sale of the low basis property in order to reduce or avoid the recognition of gain on the subsequent sale. . . . The committee believes that if a related party exchange is followed shortly thereafter by a disposition of the property, the related parties have, in effect, 'cashed out' of the investment, and the original exchange should not be accorded nonrecognition treatment"). Congress enacted two provisions that disallow nonrecognition treatment where the like-kind exchange involves a taxpayer and a related party. Section 1031(f) provides these limitations and reads as follows:

(f) Special rules for exchanges between related persons.—

_____

[11] Taxpayers could also use a like-kind exchange to minimize tax liability by accelerating the recognition of losses. See Teruya Bros., 580 F.3d at 1042; see also H. R. Rep. No. 101-247, at 1340 (1989) ("Basis shifting also can be used to accelerate a loss on retained property.")

13

(1) In general.—If—

(A) a taxpayer exchanges property with a related person,

(B) there is nonrecognition of gain or loss to the taxpayer under this section with respect to the exchange of such property (determined without regard to this subsection), and

(C) before the date 2 years after the date of the last transfer which was part of such exchange—

(i) the related person disposes of such property, or

(ii) the taxpayer disposes of the property received in the exchange from the related person which was of like kind to the property transferred by the taxpayer,

there shall be no nonrecognition of gain or loss under this section to the taxpayer with respect to such exchange; except that any gain or loss recognized by the taxpayer by reason of this subsection shall be taken into account as of the date on which the disposition referred to in subparagraph (C) occurs.

(2) Certain dispositions not taken into account.—For purposes of paragraph (1)(C), there shall not be taken into account any disposition—

(A) after the earlier of the death of the taxpayer or the death of the related person,

(B) in a compulsory or involuntary conversion (within the meaning of section 1033) if the exchange occurred before the threat or imminence of such conversion, or

(C) with respect to which it is established to the satisfaction of the Secretary that neither the exchange nor such disposition had

14

as one of its principal purposes the avoidance of Federal income tax.

(3) Related person.—For purposes of this subsection, the term "related person" means any person bearing a relationship to the taxpayer described in section 267(b) or 707(b)(1).

(4) Treatment of certain transactions.—This section shall not apply to any exchange which is part of a transaction (or series of transactions) structured to avoid the purposes of this subsection.

Section 1031(f)(1) provides the first limitation on related-party exchanges. By its terms, § 1031(f)(1) automatically disallows nonrecognition treatment only where (a) the taxpayer directly exchanges his property with a related party and (b) either the taxpayer or the related party, within two years, subsequently disposes of the replacement property received in the exchange.[12]

Even if a taxpayer's exchange falls within the disqualification of § 1031(f)(1), however, § 1031(f)(2) may resurrect nonrecognition treatment for the exchange. Section 1031(f)(2) will accord nonrecognition treatment to an exchange that otherwise falls within § 1031(f)(1)'s disallowance provision in three circumstances: (1) where the subsequent disposition resulted from a death, (2) where the subsequent disposition resulted from an involuntary conversion; or (3) where the taxpayer establishes that "neither the exchange nor [the subsequent]

_____

[12] There is no dispute in the instant case that the like-kind exchange between Ocmulgee Fields and Security Bank does not fall within § 1031(f)(1)'s disallowance provision.

15

disposition [of the exchanged property] had as one of its principal purposes the avoidance of Federal income tax."

Section 1031(f)(4) provides the second limitation on exchanges involving related parties. While § 1031(f)(1) disallows nonrecognition treatment only for direct exchanges between related parties, § 1031(f)(4) may disallow nonrecognition treatment even where a taxpayer engages in an exchange that only indirectly involves a related party, such as where the taxpayer interposes a qualified intermediary between himself and the related party. See § 1031(f)(4) (disallowing nonrecognition treatment for "any exchange which is part of a transaction (or series of transactions) structured to avoid the purposes of this subsection[—i.e., § 1031(f)]") (emphasis added); see also Teruya Bros., 580 F.3d at 1044. Congress enacted § 1031(f)(4) to prevent related parties from structuring transactions in a manner that avoided the technical provisions of § 1031(f)(1) but achieved the same result § 1031(f)(1) was designed to prevent, such as the result illustrated in the Alpha Co. hypothetical. See H.R. Rep. No. 101-247, at 1341 ("Nonrecognition will not be accorded to any exchange which is part of a transaction or series of transactions structured to avoid the purposes of the related party rules."). That is, Congress wanted to ensure that a taxpayer exchanging property with a related party, directly or indirectly, received nonrecognition

16

treatment for his exchange only if both the taxpayer and the related party continued their investment in like-kind property for a period of two years, particularly where the exchange involved manipulative basis-shifting.  See Teruya Bros., 580 F.3d at 1045 (explaining that § 1031(f) was intended "to prevent related parties from taking advantage of § 1031(d)'s basis-shifting provisions to avoid gains or accelerate losses on cashed-out investments").  If either party disposed of his investment property within that two year period, Congress wanted to disallow nonrecognition treatment unless (1) the disposition of the property resulted from a death, (2) the disposition resulted from an unanticipated involuntary conversion, or (3) the taxpayer establishes that tax-avoidance was not one of the principal purposes behind the exchange or disposition of property.  See § 1031(f)(2); see also Teruya Bros., 580 F.3d at 1047 (explaining that § 1031(f)(2)'s limitations on when the IRS may disallow nonrecognition treatment for direct exchanges between related parties also applies in circumstances where the taxpayer has interposed a qualified intermediary between himself and the related party because those limitations clarify and limit the purposes of § 1031(f)).

## II.    The Merits

In this case, the tax court concluded that § 1031(f)(4) disallowed nonrecognition treatment for realized gains that flowed from Ocmulgee Fields'

like-kind exchange. Ocmulgee Fields argues that neither it nor Treaty Fields had any intent to circumvent the purposes of § 1031(f). In other words, Ocmulgee Fields challenges the tax court's <u>factual findings</u> that it engaged in a series of transactions structured to avoid the related party rules, cash in on its investment in Wesleyan Station, and avoid taxation. See <u>Teruya Bros.</u>, 580 F.3d at 1046 n.9 (applying to clear error review to the tax court's determination of the taxpayer's purposes for structuring the transaction in a particular way). Therefore, we must affirm the tax court's decision unless we find clear error, which would require us to find that the "record lacks substantial evidence to support" the tax court's factual findings such that we are left "with the definite and firm conviction that a mistake has been committed." <u>Atlanta Athletic Club</u>, 980 F.2d at 1411-12 (quotations omitted). After reviewing the record, we conclude that the tax court's factual findings are not clearly erroneous.[13]

We begin our consideration of the merits by emphasizing that Ocmulgee Fields is seeking to receive nonrecognition treatment for its exchange under

[13] In an effort to avoid clear error review, Ocmulgee Fields attempts to paint the tax court's decision as creating a <u>per se</u> prohibition on exchanges that interpose a qualified intermediary between a taxpayer and a related party; it asserts in its briefs that the tax court ignored the evidence it presented to prove its benign purpose in structuring the transactions and engaging in the exchange. But a fair reading of the tax court's opinion refutes this assertion as the tax court considered Ocmulgee Fields' evidence and simply rejected it as unpersuasive in light of other factors that led it to infer Ocmulgee Fields structured its transactions to avoid the purposes of § 1031(f). In fact, at oral arguments, counsel for Ocmulgee Fields conceded that the tax court admitted and considered its evidence, but simply found it unpersuasive.

18

§ 1031. Section 1031's provision of nonrecognition treatment for qualified like-kind exchanges is an exception to the general rule that a taxpayer must immediately recognize gains from the disposition of property. See § 1001(c). We "strictly construe[]" exceptions to the general rule of immediate recognition. 26 C.F.R. § 1.1002-1(b); see also Teruya Bros., 580 F.3d at 1043. Thus, we afford nonrecognition treatment to an exchange "only if the exchange is one which satisfies both (1) the specific description in the Code of an excepted exchange, and (2) the underlying purpose for which such exchange is excepted from the general rule." 26 C.F.R. § 1.1002-1(b); see also Teruya Bros., 580 F.3d at 1043. "[T]he taxpayer claiming the benefit of the exception must show himself within the exception." 26 C.F.R. § 1.1002-1(b). Finally, a basic maxim of tax law is that "the substance of a transaction, rather than the form in which it is cast, ordinarily determines its tax consequences." Swaim, 651 F.2d at 1070 (quotations omitted). It is against this backdrop that we consider whether the tax court clearly erred in its factual findings that precluded Ocmulgee Fields from receiving nonrecognition treatment.

## A. Purpose for the transaction structure

Although Ocmulgee Fields has let loose a barrage of explanations for why it structured its exchange as it did, the record adequately supports the tax court's

finding that Ocmulgee Fields structured its transactions to avoid the purposes of § 1031(f).

As a starting point, we can look to the actual consequences of Ocmulgee Fields' transactions to ascertain its intent. See Teruya Bros., 580 F.3d at 1045-46 (looking to the actual consequences to discern a taxpayer's intent). Here, Ocmulgee Fields and Treaty Fields cashed-in on their low-basis property, Wesleyan Station. Although Ocmulgee Fields continued to hold investment property after the exchange, once the dust settled, Treaty Fields held only the cash proceeds from the sale of the Barnes & Noble Corner property. As discussed, Congress accorded nonrecognition treatment to like-kind exchanges in the first instance because after a like-kind exchange both parties still had a continuing investment after the exchange, albeit in a different property; here, Treaty Fields no longer had a continuing investment. Moreover, Congress enacted § 1031(f) because of its disapproval of taxpayers' use of § 1031 to cash-in on a low-basis investment property, but to pay taxes as if it were cashing in on the high basis property; here, Ocmulgee Fields and Treaty Fields cashed in on the low-basis property, Wesleyan Station, but paid taxes only on the gains from Treaty Fields' sale of the high-basis property, the Barnes & Noble Corner.[14] Thus, the substantive

---

[14] The means of achieving this result are slightly different in the context of a direct exchange between a related party and a taxpayer and the context of an exchange, such as here,

20

result of Ocmulgee Fields' series of transactions supports an inference that Ocmulgee Fields structured its transactions to avoid the purposes of § 1031(f): it was the economic equivalent of a direct related-party exchange for which § 1031(f)(1) would disallow nonrecognition treatment.

Moreover, although it is not necessarily a dispositive factor by itself, we can look to the unneeded complexity in the series of transactions to help us in inferring Ocmulgee Fields' intent. See Teruya Bros., 580 F.3d at 1046 (drawing an adverse inference from the taxpayer's decision to use a qualified intermediary when it could have achieved the same result through a direct exchange but the direct exchange would not have received nonrecognition treatment). Ocmulgee Fields could have achieved the same result by simply engaging in a direct exchange of property with Treaty Fields, and Treaty Fields could have then sold Wesleyan Station to the McEachern Family Trust. If Ocmulgee Fields had taken this approach, however, § 1031(f)(1) would have automatically disallowed nonrecognition treatment for the exchange because Treaty Fields disposed of

---

where a taxpayer has interposed a qualified intermediary between himself and the related party. Our Alpha Co. hypothetical illustrates how the taxpayer and the related party achieve this result in a direct exchange: the taxpayer, Alpha Co., directly exchanges its low-basis property, Blackacre, for a related party's high-basis property, Charlie Co's Whiteacre, in anticipation of the related party subsequently selling Blackacre because, after the exchange, Blackacre will have taken on Whiteacre's higher basis. Although the means are different, the result is the same: the taxpayer and the related party cash in on the low-basis property but pay taxes on it as if that property had always had a high-basis, thereby reducing their overall tax burden through nonrecognition treatment despite cashing in on their low-basis investment property.

21

Wesleyan Station within two years of the exchange. And it is unlikely that § 1031(f)(2) would have resurrected nonrecognition treatment for the exchange because it would have involved the exchange of a high-basis property for a low-basis property in anticipation of the sale of the low-basis property. Cf. H.R. Rep. No. 101-386, at 614 (1989) (Cont. Rep.) (explaining that a taxpayer is more likely to establish that tax-avoidance was not a principal purpose where the exchange does not involve this type of basis-shifting and a subsequent disposition of the low-basis property). Therefore, unless Ocmulgee Fields offered a persuasive justification for the complexity of its transactions, we can infer that Ocmulgee Fields added layers of complexity to avoid the purposes of § 1031(f).

Here, Ocmulgee Fields has offered no persuasive justifications that would support a conclusion that the tax court committed clear error. Ocmulgee Fields asserts that the Barnes & Noble Corner property was merely a fall-back position, and it had engaged in a complex series of transactions with the genuine desire to find a replacement property held by an unrelated third party. But, despite purportedly beginning its search for a replacement property even before contracting with the McEachern Family Trust, Ocmulgee Fields had examined only a small number of potential replacement properties; it also entered into a sales contract for the Barnes & Noble Corner property just six days after it engaged

22

Security Bank as a qualified intermediary. Moreover, Ocmulgee Fields offers no explanation, aside from tax-avoidance, for why it maintained its four-party transaction structure once it settled on the Barnes & Noble Corner property. The contract with the McEachern Family Trust for the sale of the Wesleyan Station contract had been fulfilled; it did not require Ocmulgee Fields to structure the transaction as a like-kind exchange. The combination of these factors undermines the persuasiveness of Ocmulgee Fields' justification for the complexity of the transaction.

## B. Purpose for the exchange[15]

Ocmulgee Fields claims that even though it cashed in on its low-basis property as part of the exchange, it should receive nonrecognition treatment because unwarranted tax-avoidance was not a principal purpose of the exchange. But we find adequate evidence in the record to conclude the tax court did not commit clear error in rejecting that argument. The combination of several factors, some of which we have already discussed, support the tax court's finding of a tax-avoidance purpose: (1) Ocmulgee Fields and Treaty Fields cashed in on their low-

---

[15] The analysis of this section involves the recognition of tax consequences when the exchange or disposition "had as one of its principal purposes the avoidance of Federal income tax," § 1031(f)(2)(C), as § 1031(f)(2)(C) is necessarily encompassed by the restriction in § 1031(f)(4) that "[t]his section [§ 1031] shall not apply to any exchange which is part of transaction (or series of transactions) structured to avoid the purposes of this subsection [§ 1031(f)]." See Teruya Bros., 580 F.3d at 1047.

basis property but paid taxes as if they had cashed in on their high-basis property; (2) Ocmulgee Fields and Treaty Fields significantly reduced their immediate taxes by engaging in the exchange; and (3) Ocmulgee Fields and Treaty Fields enhanced these immediate tax savings by shifting nearly the entire burden of taxation to the party with the lowest tax rate, Treaty Fields.[16]  And to rebut the negative inference drawn from these factors, Ocmulgee Fields offers only unpersuasive evidence of adverse future tax consequences and purported business reasons for the exchange.

> **i.    Cashing-in on the low-basis property but paying taxes only on the disposition of the high-basis property**

The transaction structure allowed Ocmulgee Fields and Treaty Fields, as a unit, to cash in on their low-basis property (Wesleyan Station), but pay taxes as calculated on the sale of their high-basis property (the Barnes & Noble Corner). Because both properties had sold for a similar amount but one had a higher basis, Ocmulgee Fields and Treaty Fields reduced their tax burden by creating a transaction structure that made it seem as if they had disposed of their high-basis property (the Barnes & Noble Corner property) when, in fact, they had cashed in on their low-basis property (Wesleyan Station).  This type of basis-shifting that allows a taxpayer to cash in on the low-basis property but pay taxes as if it were

---

[16] For purposes of our analysis, we consider Ocmulgee Fields and Treaty Fields, including its partners, as an economic unit.  See Teruya Bros., 580 F.3d at 1047.

24

cashing in on the high-basis property is precisely what Congress designed

§ 1031(f) to prevent when the transaction involves related parties and a quick sale.

See H. R. Rep. No. 101-247, at 1340 (discussing the problem of taxpayers using

basis-shifting and nonrecognition treatment to minimize the amount of

immediately recognized gains and accelerate losses while cashing in on their low-

basis investment property).[17]

In this regard, the tax court used a helpful comparative analysis. The tax

court recast the actual exchange that occurred as a direct exchange between

Ocmulgee Fields and Treaty Fields followed by Treaty Fields' sale of Wesleyan

Station to the McEachern Family Trust. See Ocmulgee Fields, 132 T.C. at 118-19.

It then considered whether, under those circumstances, a tax court would infer that

tax-avoidance was a principal purpose of the exchange or subsequent disposition of

Wesleyan Station. See id. at 119. As the tax court pointed out, and as we

discussed earlier, a direct exchange would have involved the exchange of a low-

basis property (Wesleyan Station) for a high-basis property (the Barnes & Noble

Corner) in anticipation of the immediate disposition of the low-basis property

(Wesleyan Station) once it took on the higher basis of the other property (the

---

[17] As discussed previously, the means of achieving this result are slightly different in the context of a direct exchange between a related party and a taxpayer and the context of an exchange, such as here, where a taxpayer has interposed a qualified intermediary between himself and the related party.

25

Barnes & Noble Corner), thereby reducing the overall tax burden incurred by Ocmulgee Fields and Treaty Fields—in this case, by approximately $2 million. See id. at 118. And, as the tax court noted in its opinion, see id., it is this type of tax manipulation that Congress designed § 1031(f) to prevent. Cf. H. R. Rep. No. 101-386, at 614 (Cont. Rep.) (explaining that a taxpayer is more likely to establish that tax-avoidance was not a principal purpose where the exchange does not involve this type of basis-shifting). We think the tax court's approach to the issue sheds light on Ocmulgee Fields' purpose: if a taxpayer structures its exchange in a manner that avoids the rules on direct exchanges between related parties, we think a tax court can draw inferences against the taxpayer.

### ii. Immediate tax savings

Ocmulgee Fields and Treaty Fields netted immediate tax savings by engaging in the exchange. Through the exchange, Ocmulgee Fields avoided immediate recognition of $6 million in gains from its disposition of Wesleyan Station. These gains would have yielded over $2 million in tax liability. Ocmulgee Fields counters that the exchange required Treaty Fields to recognize just over $4 million in gains it would not otherwise have recognized. But, as an economic unit, Ocmulgee Fields and Treaty Fields still netted a reduction of $2 million in immediately recognized gains. Ocmulgee Fields also points out that the

26

exchange caused it to recognize $475,396 in installment income. However, as the tax court explained, Ocmulgee Fields failed to quantify the cost of accelerating otherwise deferred income, which "was surely much less than $475,396," see Ocmulgee Fields, Inc., 132 T.C. at 119, and insubstantial when compared to the value of avoiding immediate recognition of $2 million in gains.

### iii. Shifting the tax burden to Treaty Fields

In addition to reducing the amount of gain Ocmulgee Fields and Treaty Fields would have to recognize immediately, the exchange also shifted the entire burden of taxation (the accelerated installment income aside) to the party with the lowest tax rate, Treaty Fields. Unlike Ocmulgee Fields, which was taxed at the corporate rate of 34%, the gains recognized by Treaty Fields were passed through to its partners, who were taxed on the gains at the lower rate of 15%. In fact, one partner in Treaty Fields was able to further reduce his tax burden by offsetting the gains passed through to him with a charitable deduction of $2,021,375.

### iv. Ocmulgee Fields' unpersuasive rebuttal evidence

Together, the cashing in on the low-basis property, the immediate tax savings, and the shifting of taxation to Treaty Fields, support the tax court's finding that Ocmulgee Fields' had a principal purpose of tax-avoidance for the exchange. See § 1031(f)(2)(C). Ocmulgee Fields attempts to counter this evidence

27

by arguing it believed adverse future tax consequences would outweigh any immediate tax savings from the exchange, but that, despite these adverse future tax consequences, it went ahead with the exchange for legitimate business reasons. Ocmulgee Fields' arguments, however, do not persuade us that the tax court committed clear error.

Ocmulgee Fields first highlights three adverse future tax consequences of the exchange: (1) that gains from a future sale of the Barnes & Noble Corner property by Ocmulgee Fields would be taxed at a 34% rate instead of the 15% rate that the partners of Treaty Fields would have paid if they later disposed of the property, (2) that one of Treaty Fields' partners lost a future § 754 partnership election for the Barnes & Noble Corner property that would have been available upon the death of the other partner, and (3) that the exchange reduced the amount of depreciation deductions that could be taken on the Barnes & Noble Corner Property.[18] But these arguments do not establish that the tax court clearly erred. As the tax court explained, the advice Ocmulgee Fields claims to have relied on with respect to the first two tax consequences was, at best, speculative and unquantified. See Ocmulgee Fields, 132 T.C. at 119-20. The same can be said

---

[18] Ocmulgee Fields raises an additional argument that a real estate commission clause in its contract to sell Wesleyan Station to the McEachern Family Trust also undermines the tax court's finding of a tax-avoidance purpose. Ocmulgee Fields, however, failed to develop this argument in a manner sufficient to have any persuasive effect.

28

regarding the advice about the value of the lost depreciation deductions: Ocmulgee

Fields failed to quantify the value of those future deductions, which would have

been offset, at least to some degree, by Treaty Fields' ability to invest the proceeds

from the sale of the Barnes & Noble Corner property in new depreciable

property.[19]  The speculative and unquantified nature of this tax advice provides an

adequate basis to support the tax court's discrediting of Ocmulgee Fields'

arguments and witnesses on this issue.

Ocmulgee Fields' next argues that it had legitimate business purposes for the

exchange, but this argument also fails to establish clear error.  Ocmulgee Fields

claims it acquired the Barnes & Noble Corner property in the exchange because

acquisition of that property would yield operational efficiencies, increase the value

---

[19] The tax court ambiguously stated that Ocmulgee Fields' "adjusted basis in Wesleyan Station shifted to the Barnes & Noble Corner and, therefore, it gave up no depreciable basis." See Ocmulgee Fields, 132 T.C. at 119.  To the extent the tax court was stating that Ocmulgee Fields would still be able to make depreciation deductions, we agree.  But to the extent that the tax court was stating that there was no difference in the amount of deductions available to Ocmulgee Fields and Treaty Fields, we disagree, but that disagreement does not lead us to find clear error in the tax court's ultimate factual finding.  See Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1256 (11th Cir. 2001) ("[W]e may affirm [a lower court's] judgment on any ground that finds support in the record.") (quotations omitted).

If Treaty Fields had retained the Barnes & Noble Corner property, the property would have had a basis of over $2 million against which to take depreciation deductions.  By engaging in the exchange, however, the Barnes & Noble Corner property took on the $716,164 basis of Wesleyan Station, thereby reducing the basis against which Ocmulgee Fields could take depreciation deductions.  Because we consider the tax consequences to Ocmulgee Fields and Treaty Fields as a unit, the exchange did reduce the amount of depreciation deductions available to that unit.

of its property holdings, and increase the value of Ocmulgee Fields. As the tax court explained, however, Ocmulgee Fields offered only "self-serving testimony" that legitimate business purposes motivated its decision. Id. at 120. Moreover, these purported business reasons do not explain why Ocmulgee Fields engaged in a complex transaction structure when it could have achieved the same business gains through a far less complex structure. And, even assuming Ocmulgee Fields in fact had legitimate business reasons for acquiring the Barnes & Noble Corner property, the mere existence of legitimate business purposes does not preclude a finding that Ocmulgee Fields' principal purpose for the exchange was tax avoidance. Cf. Slappey Drive Indus. Park v. United States, 561 F.2d 572, 585 (5th Cir. 1977) (asking, in applying a different but comparable statute, whether tax-avoidance purposes predominated over non-tax-avoidance purposes because the statute disallowed certain deductions, credits, and other allowances "where the principal purpose of the underlying transaction was tax avoidance") (emphasis added).

## CONCLUSION

For the foregoing reasons, we conclude that the tax court did not clearly err in finding that Ocmulgee Fields' exchange with Security Bank was part of a series of transactions structured to avoid the purposes of § 1031(f). Accordingly, we

30

affirm the tax court's conclusion that § 1031(f)(4) disallows nonrecognition treatment for the exchange.

AFFIRMED.