[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-14441

_____

Agency No. 13104-11

JAMES CLAY,
AUDREY OSCEOLA,

Petitioners-Appellants,

versus

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee.

_____

Petition for Review of a Decision of the
United States Tax Court

_____

(March 16, 2021)

Before WILSON, GRANT, and TJOFLAT, Circuit Judges.

GRANT, Circuit Judge:

   In the late 1980s, the Miccosukee Tribe decided to build a casino in Florida.

Acres of land between Miami and the Everglades now host a hotel, a concert hall, a

food court, a restaurant, and a gift shop.  And, of course, gaming.  The casino's

profits skyrocketed, and the Tribe chose to share those profits with its members. During the years relevant to this case, each tribe member—man, woman, and child—received large payments, starting at almost $100,000 annually and climbing to nearly $160,000.

But the Tribe did more than just write the checks; it also encouraged members to hide their payments from the IRS. The taxpayers here followed the Tribe's advice, and they are now subject to hundreds of thousands of dollars in tax deficiencies. They offer various reasons why they do not owe taxes on these payments. One assertion is that any taxes are barred by a statute that exempted an earlier land transfer from taxation; another is that the payments are merely non-taxable lease payments from the casino. Unfortunately for these Tribe members, the payments are just income—taxable income. That means we affirm.

I.

The Miccosukee Tribe of Indians of Florida is a federally recognized American Indian tribe under the Indian Reorganization Act of 1934. *See* Pub. L. No. 73-383, 48 Stat. 984. James Clay and Audrey Osceola, a married couple with five children at home, are enrolled members of the Tribe. And that enrollment can have financial benefits. For example, starting in 1984 the Tribe collected a small sales tax on goods sold by tribal businesses on its land. The Tribe used those revenues to fund its day-to-day operations, and also to make quarterly distributions to its enrolled members. Those early distributions weren't much, though; they typically amounted to no more than $100 per quarter for each member.

Things began to change in 1988. That year, Congress enacted the Indian Gaming Regulatory Act. *See* Pub. L. No. 100-497, 102 Stat. 2467 (1988) (codified at 25 U.S.C. § 2701 *et seq.*). The Gaming Act authorized tribes to engage in various gaming activities—lotteries, bingo, poker, and so on. *See* 25 U.S.C. §§ 2703(7)(A), 2710(b)(1). So the following year the Tribe decided to enter the gaming business and struck a deal with an outside company to "construct, manage and operate a Class II gaming facility for the Tribe."[1] To that end, the company purchased land near the Tribe's reservation—land which was eventually placed in trust for the Tribe—and went about building the casino there. But relations between the Tribe and company quickly soured, and the Tribe took over full management of the casino in 1993.

Once the casino proved to be profitable, the Tribe started imposing a gross receipts tax on "all amounts" received by the casino, including admission fees, wagers, and revenues from its gift shop and other activities. The Tribe's chairman instructed its finance director to open a checking account to hold the proceeds from the gross receipts tax. Like it had done with its sales tax, the Tribe used those funds to make quarterly distributions and other payments to its members. At the end of every quarter, the Tribe calculated the amount it received in gross receipts taxes and then allocated an equal share to each member. Distributions for minor children were typically given to their mothers.

---

[1] The Gaming Act "divides Indian gaming into three categories: class I, class II, and class III." *Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians of Fla.*, 63 F.3d 1030, 1032 n.3 (11th Cir. 1995). Class II gaming covers bingo and includes "pull-tabs, lotto, punch boards, tip jars, instant bingo, and other games similar to bingo." 25 U.S.C. § 2703(7)(A). It can also include some types of card games. *Id.*

But the Tribe's involvement ran deeper than just handing out the money. For years, the Tribe's leadership also urged members not to report the payments on their tax returns. The Tribe even encouraged members to cash their checks at its administration office rather than at banks; according to the Tribe's chairman, cashing the checks at banks "would likely result in a report being made to the IRS." Going even further, the Tribe's chairman told members "not to list the quarterly distributions on credit applications or when applying for food stamps, Medicare, or Medicaid." As he put it, that would frustrate the Tribe's efforts to "protect tribal members from facing problems with [the] IRS." The chairman also warned that if the IRS found out about the cash, it may "investigate how the money was obtained."

It turns out he was right. Despite the chairman's best efforts, the IRS caught wind of the payments. In 2010, it "audited dozens of returns filed by members of the Tribe," including Clay and Osceola's. The next year, the IRS issued Clay and Osceola a notice of deficiency for the 2004 and 2005 tax years. And two years later, it issued them another notice of deficiency for 2006. The notices for those years informed them that they were liable for yearly income tax deficiencies of roughly $192,000, $310,000, and $389,000. The notices also stated that Clay and Osceola were subject to accuracy-related penalties under 26 U.S.C. § 6662(a).

Clay and Osceola challenged the deficiency findings and penalties in both notices in the tax court. They had partial success—the tax court issued a 45-page opinion sustaining the deficiency determinations, but rejecting the accuracy-related penalties. They appealed.

4

II.

We review the tax court's legal conclusions de novo. *Ocmulgee Fields, Inc. v. Comm'r*, 613 F.3d 1360, 1364 (11th Cir. 2010). But we review its factual findings for clear error. *Id.*

III.

The Internal Revenue Code casts a wide net. For starters, it applies to everyone, including American Indians. *See Squire v. Capoeman*, 351 U.S. 1, 6 (1956). It also applies to everything—at least, everything that makes up one's "gross income." 26 U.S.C. § 61(a). And the definition of gross income "sweeps broadly," including "all income from whatever source derived." *United States v. Burke*, 504 U.S. 229, 233 (1992) (quoting 26 U.S.C. § 61(a)). Unless there is a specific exemption, all gains are subject to taxation. *See Comm'r v. Glenshaw Glass Co.*, 348 U.S. 426, 430 (1955).

Here, Clay and Osceola do not dispute that their per capita payments qualify as "gross income" under the Code. It is not hard to see why. For one thing, the very statute that allows tribes to run class II gaming activities—the Gaming Act— also says that any "per capita payments" made from those activities must be "subject to Federal taxation." 25 U.S.C. § 2710(b)(3); *see also United States v. Jim*, 891 F.3d 1242, 1244–45 (11th Cir. 2018).[2]

_____

[2] We reject any contention that the payments do not come from "net revenues" simply because the Tribe taxes the casino's "gross receipts" instead. In *United States v. Jim*, we declined to "place form over substance in analyzing the taxability" of these distributions. 891 F.3d at 1250 n.17. We now do so yet again and reiterate that the Gaming Act "subjects to federal taxation the per capita payments an Indian tribe makes to its members from gaming revenue, no matter the mechanisms devised to collect the revenue or administer the payments." *Id.* We also reiterate

So Clay and Osceola are left to argue that Congress exempted their payments from taxation. The problem for them is that any tax exemption must be "clearly expressed." *Capoeman*, 351 U.S. at 6. Absent "clear statutory guidance" we "ordinarily will not imply tax exemptions." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 156 (1973). Even so, Clay and Osceola contend that Congress provided them with two qualifying exemptions. First, they point to the Miccosukee Settlement Act of 1997. *See* Pub. L. No. 105-83, 111 Stat. 1624 (codified at 25 U.S.C. § 1750 *et seq.* (2006)).[3] And second, they claim an exemption for "land lease" payments. Neither of the asserted exemptions, however, offers relief.

### A.

Clay and Osceola first look to the Miccosukee Settlement Act in their search for a workable exemption. Congress passed the Settlement Act in 1997, marking the end of a dispute between Florida and the Tribe. That dispute began in 1991 when Florida sought to build a highway through Miccosukee lands. The Tribe sued, and after years of litigation, the parties reached a settlement agreement. In that agreement, Florida promised to give the Tribe, among other things, a six-acre

---

that even if the payments did not come from "net revenues," they would still be included in gross income absent a "clearly expressed" tax exemption. *Capoeman*, 351 U.S. at 6.

[3] Portions of the Settlement Act were codified at 25 U.S.C. § 1750 *et seq.*, but have since been omitted. We therefore cite to the 2006 edition of the U.S. Code throughout this opinion when referencing the Settlement Act.

parcel of land and nearly $2.2 million.  In exchange, the Tribe agreed to grant the State the rights-of-way and easements it needed for the highway project.

Because the settlement agreement "contemplated land transfers," it required Congress's blessing.  25 U.S.C. § 1750(4) (2006).  And—after finding that the agreement was "in the interest of the Miccosukee Tribe"—Congress gave that blessing in the Settlement Act.  *Id.* § 1750(5).  But it also went a step further, and provided that none of the "moneys paid" or "lands conveyed" to the Tribe under the Settlement Act or the agreement would be "taxable under Federal or State law."  *Id.* § 1750e(c).

Clay and Osceola hang their hats on this provision, asserting that it exempts their per capita payments from taxation.  They say that the Settlement Act "could not be any clearer in exempting the Miccosukee lands from federal and state taxes."  And they read the Act broadly—even as empowering the Tribe to collect and distribute money to its members without the members including it in "any taxable income determination."  But Clay and Osceola do not simply offer their own interpretation of the Settlement Act for our consideration.  They also say that we *must* adopt that interpretation for ourselves.  In their words, we are obliged to read it as "the Tribe understood it at the time of its creation with any ambiguities being interpreted in favor of the Tribe."

To be sure, courts construe statutes "liberally" in favor of American Indians and resolve reasonable ambiguities to their benefit.  *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985); *see also South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 506 (1986).  But that rule has its limits.  After all, we

cannot "ignore plain language" that "clearly runs counter" to their claims. *Oregon Dep't of Fish & Wildlife v. Klamath Indian Tribe*, 473 U.S. 753, 774 (1985); *Catawba*, 476 U.S. at 506. Nor can we create "ambiguities that do not exist." *Catawba*, 476 U.S. at 506.

Yet Clay and Osceola ask us to do just that. Simply put, the Settlement Act is unambiguous; it exempts from taxation only the "moneys paid" and "lands conveyed" to the Tribe "under this part or the Settlement Agreement." 25 U.S.C. § 1750e(c) (2006). The scope of that tax exemption is no mystery. In the Act itself, Congress notes that the Tribe will receive "monetary payments" and "new reservation lands" under the agreement. *Id.* § 1750(5). In fact, Congress references those specific lands throughout the Act. *See id.* §§ 1750(6), (7); 1750a(4); 1750c(4); 1750d. With that context, the language's meaning is clear—it merely negated the normal tax effects of the money and land transfers described in the Settlement Act.

That said, even the most generous reading of the Settlement Act wouldn't help. Say we interpreted the Act as providing an indefinite tax exemption for the "lands" conveyed under it or the agreement. The casino revenues still don't fit the bill. For one thing, the casino's land was not conveyed under either the Settlement Act or the agreement. As Clay and Osceola concede, the casino was built nearly a decade before on land placed in trust for the Tribe. Moreover, an exemption for "lands" only exempts income "derived directly" from those lands. *Capoeman*, 351 U.S. at 9 (quotation omitted). And this Court has already held that casino revenues do "not derive directly from the land." *Jim*, 891 F.3d at 1250 n.17. That means

8

even the reading of the Settlement Act espoused by Clay and Osceola would not provide the tax exemption they seek.[4]

B.

Clay and Osceola argue in the alternative that the payments are tax exempt because they stem from a lease for the use of the Tribe's lands. This argument has both a factual problem and a legal one. First, the factual problem. The tax court found that there was no lease agreement, and that finding was not clearly erroneous. *See Ocmulgee Fields*, 613 F.3d at 1364. Indeed, Clay and Osceola have not pointed to anything in the record even resembling a lease agreement. And a closer look reveals why: no lease ever existed. Consider the ordinance that funds the Tribe's per capita payment scheme. That ordinance says that the casino "shall be subject to a gross receipts tax"—it never says anything about a lease. And the casino's financial statements reinforce that point. Those statements specifically confirm that "[n]o rental payment is currently required for the use of" the Tribe's land. It is hard to make a case that the payments were lease payments without a lease.

---

[4] At one point, Clay and Osceola contend that the Tribe's chairman is the Secretary of the Interior's "designated representative," and that he was therefore entitled to interpret the Settlement Act as exempting from taxation "all lands of the Tribe." Even assuming the chairman's status as a "designated representative," we find no support for his claimed authority to definitively interpret unambiguous acts of Congress. And the only two provisions they cite say nothing of the sort. The first is 25 U.S.C. § 2. That provision just confers on the Commissioner of Indian Affairs general authority over "Indian affairs." And the second is a regulation permitting the Commissioner to "waive or make exceptions to his regulations" in certain circumstances. 25 C.F.R. § 1.2. But of course, the Settlement Act is a statute—not a regulation.

The second problem is a basic doctrinal one. Tax exemptions, as we said earlier, must be "clearly expressed." *Capoeman*, 351 U.S. at 6. That means "clear statutory guidance" is required. *Mescalero*, 411 U.S. at 156. But Clay and Osceola have not identified any statutory exemption for lease payments. They instead assert that revenue from the "leasing of undeveloped Tribal lands has always been considered tax exempt," and that development makes no difference for the application of that rule. They cite a handful of revenue rulings to support this claim.

Revenue rulings, of course, are not binding authorities. *Batchelor-Robjohns v. United States*, 788 F.3d 1280, 1297 (11th Cir. 2015). But even if we were obligated to follow them, the rulings cited here offer no aid. To begin, two of the rulings have nothing at all to do with leases. The first notes that payments to members of tribal councils for their services are not "wages" for some purposes. Rev. Rul. 59-354, 1959-2 C.B. 24. The second deals with "lands held in trust by the United States Government for the Sac and Fox Indians." Rev. Rul. 63-244, 1963-2 C.B. 21. And the others, by contrast, do mention "rentals." *See* Rev. Rul. 56-342, 1956-2 C.B. 20; Rev. Rul. 67-284, 1967-2 C.B. 55. But they do so in the context of *Squire v. Capoeman*, a Supreme Court decision holding that income "derived directly" from lands allotted under the General Allotment Act of 1887 is exempt from taxation.[5] 351 U.S. at 9 (quotation omitted); Pub. L. No. 49-105, 24 Stat. 388. *Capoeman*'s holding on that issue cannot apply here though—

---

[5] The General Allotment Act sought to "allot" tribal lands—that is, parcel them "into smaller lots owned by individual tribe members." *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2463 (2020).

10

Miccosukee lands have never been allotted, under the General Allotment Act or otherwise.  And again, we have already held that casino revenues do "not derive directly from the land" anyway.  *Jim*, 891 F.3d at 1250 n.17.  So this argument misses the mark legally as well as factually.

*     *     *

The Miccosukee leadership correctly predicted that its members would face "problems" with the IRS if the agency learned of the Tribe's unreported payments. Because Clay and Osceola have not identified any applicable tax exemptions, the judgments of the tax court are **AFFIRMED**.